# EXHIBIT 1 – GOLDMAN REPORT (REDACTED)

ROBERT GOLDMAN, PSY.D
PSYCHOLOGIST
283 COMMACK ROAD
COMMACK, NEW YORK 11725
631-499-7500

December 11, 2014

*Reason for Referral*

Mary Tardif is a 26 year-old female who was referred for a psychological evaluation for purposes of assessing her psychological functioning.

Amount of Compensation

Pursuant to the Federal rules please be advised that I have been compensated $7,000 for this report which includes any testimony required at trial.

Evaluation Techniques

Behavioral Observations
Clinical Interview of Mary Tardif –
       December 4, 2014 -2hours, December 8 2014, 2 hours,
       December 11, 2014 2 hours

Psychometric testing of Mary Tardiff
MMPI-II
MCMI-III

Following Medical Records of Mary Tardif from January 12, 2012-April 17, 2012
    Bellevue
    CPEP
    Beth Israel Records
November 6, 2014 Deposition of Mary Tardif

Neurologist records -- Peter B. Wade, M.D. from 2009-2010

1

P3577

### Background Via Clinical Interview

Mary was born in Lima, Peru and adopted at the age of two by her parents, Joseph (60) and Elizabeth (56). She was also adopted with another boy, James (26) who was not biologically related to her.

Her father was employed as an engineer for Honeywell, and her mother works at Newborn Nursery. Mary reports that she had a very close relationship with her father, until he abruptly left the family when she was 19. He moved to California. Mary reports that she has very little contact with her father.

Mary grew up in East Granby, Connecticut. Ms. Tardif reports that she had difficulty fitting in a predominately white culture. At the age of 13, Mary reports that she found her community niche when she was introduced to Capoeira, a combination of Brazilian dance, acrobatics, singing and martial arts.

As a high school student, Mary had a passion for the performing arts. She was accepted into the Academy of the Performing Arts in Hartford. She split her high school career between her home district and the Academy. She performed in her High School's first production of "CATS".

Mary reports that at the age of 16 she ███████████████████████████ was diagnosed with severe depression. She was prescribed an antidepressant and began to see a counselor.

Mary attended Bay Path College, located in Springfield Massachusetts, for her first year of college. Her major was criminal justice. She returned home to attend Capital Community College, and then attended Marymount Manhattan College for one year. She reports that she is approximately one semester shy from graduating. Mary explains that the reason why she did not finish at Marymount was because of financial difficulties.

Mary returned home to serve as a substitute teacher at the Academy of Performing Arts in Hartford. As she worked for the Academy, she was also working on becoming an EMT basic.

Mary passed her EMT class and returned to Manhattan. Mary came to Manhattan to participate in the Occupy Wall Street protest. Mary reports that she was always interested in community activism. When in middle school, Mary started the school's first homeless shelter program. The school would send a group of students bi-monthly, along with a teacher, to a homeless shelter in Hartford. Mary also reports that her parents would often take in her friends who were experiencing difficulties at their own homes.

Prior to leaving her home, Mary explains that ███████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Mary reports that she has experienced ████████████████████
████████████████████████████████████████████████████████

During the week of January 16, 2012 Mary reports that she was having difficulty coping with ███████████████████████████████
Consequently, ██████████████████████████████████████████
█████████████ On January 21, 2012 she was admitted to Bellevue Hospital ████████████████████████████████████████████
████████████████████. According to the medical records, "Pt currently endorses many symptoms of both depression and PTSD, with symptoms worsening in the last month and acutely in the last week."

Mary was discharged from the hospital on January 24, 2014. ████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

On February 28, 2012 Mary went to Bellevue Hospital for a follow up assessment. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████ She was diagnosed with an Axis I Major Depressive Disorder Episode, in partial remission and PTSD.

Mary began receiving counseling ███████████████████ in January of 2012 and continued to spend much of her time participating in the "Occupy Wall Street" protest. On March 17, 2012 Mary was arrested by the police for protesting at Zuccotti Park and taken to the precinct. She was grabbed from behind, shoved down to the ground and kicked. Once arrested, she observed that a fellow arrestee's wrists were contorted from the handcuffs. She told the police that the woman needed to be taken to the hospital. In response, the police officer put his arms around her neck and told her to "shut the fuck up and left her screaming" (November 6, 2014 deposition, page 39, line 13 and 14). The arrestees were then transported to the Seventh Precinct.

As 10pm was approaching, Mary reports she repeatedly pleaded with the police officers to give her anti-seizure medication, Lamictal. Mary has been diagnosed with epilepsy since 2009 and has been has under the care of a Neurologist, Peter Wade. According to Mary, she is prescribed Lamictal twice a day, at 10am and 10pm. She reports that she felt like a ticking time bomb, when she was denied her medication. She ultimately suffered a seizure in her cell and was taken to Bellevue Hospital. She was cleared by the hospital for arraignment and returned to the precinct. As 10am was approaching, Mary again requested her medication. However, her request was once again denied. A police officer discovered her collapsed body in her cell, and she was taken to Bellevue Hospital. She was ultimately discharged from the hospital and finally arraigned on the criminal charges.

Mary reports that she tried her best to continue to participate at the Occupy Wall Street protest but began having nightmares and flashbacks concerning the March 18th seizures. On April 16, 2012 Mary was again arrested for protesting. Mary reports that she, along with other protestors, observed an anti-protestor punch a fellow protestor. Many of the protestors were yelling because the police were arresting the protestor. Mary was grabbed by her shirt collar, tackled to the ground by a police officer and arrested. Mary reports that she was in the police wagon along with other protesters, when she began seizing. Despite her fellow passengers yelling for help, the police ignored their pleas (November 6, 2014 deposition, page 94, lines 4-15).

Since her arrest on March 17, 2012, Mary has become very reclusive. She does not like going outside much for fear that something bad may happen.

4

She is less trusting of others. She does not like to be in closed-in spaces and needs to have the doors open in rooms that she occupies.

At her deposition, on November 6, 2014, Mary was asked to explain any psychological injuries as a result of incidents that gave rise to the lawsuit. Mary gave the following response:

"I am paranoid about my medical condition. I am paranoid walking down the street. I can't be—actually I don't like places where there are police officers around. I don't have to actually be doing anything wrong to feel that I can get grabbed off of the street.

"An example would be I have a Disability Metrocard, which I have been detained six times for having, because I don't look disabled enough to have one. It is very real sense of fear to be detained for swiping onto a subway. It is not—it is not a good thing." (Page 138, lines 10-15).

When asked to clarify Mary stated, "Regardless of what I do or anything, I cannot at any moment stand to get arrested without cause, without being told why, without anything. And I mentally cannot take it any more of it. I am tired. I am stressed out. I can't handle it anymore. I can't be around it anymore. I can't. So I do a lot of my activism on Facebook, because I would rather be trying to do something in a safe environment than trying to do something to get hurt.

"I have nightmares. I see—I see myself being trapped and I hate it. I hate being in small places. I can't stand it. If I ever had to be in a cell again, I wouldn't know how to handle it. I can't be in small places for too long. I can't take it. I can't do it. I have really bad headaches. Um, I see certain people that I know and I have to walk away because I can't do it. I get like flashbacks of nights when I see certain people. I just see them and it is not there."

When this examiner asked her to further explain her recurring nightmares, Mary reports that she dreams that she is trapped in a jail cell and cannot get out. The only thing in the jail cell is a clock.

Mary is currently on physical disability because of the increased frequency of her seizures. Mary currently works as a volunteer at St. Paul and St. Andrew Church. She reports feeling safe there because there is less interaction with

5

P3581

people in closed in places, and she can do much of her work on her computer at home.

*Psychometric Testing*

Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-II)

Mary was administered the MMPI-II to assess her level of personality functioning. However, because her K scale was so elevated, the profile is invalid. The K scale is a validity measure which is used to measure her level of symptomatology. The MMPI-II is hyper-sensitive to levels of psychopathology. Consequently, there is no adjustment within the MMPI-II to adjust for those subjects experiencing extreme distress.

Given the inability to compensate for the high reported levels of distress, the Millon Clinical Multiaxial Inventory-III (MCMI-III) was administered to Mary to assess for convergent validity within the MMPI-II.

In contrast to the MMPI-II, the MCMI-III corrects for the over-reporting of symptomatology. Mary's response style may convey feelings of extreme vulnerability that are associated with a current episode of acute turmoil. The impetus for the response style is related to trauma associated in her life.

Given her most recent traumatic experiences associated with her arrests, and her current presentation and level of functioning, it does not appear that her symptomatology is exaggerated. However, the BR scores reported for her have been modified to account for the high self-revealing inclinations indicated by the high raw score on Scale X (Disclosure) and the psychic tension and dejection indicated by the elevations on Scale A (Anxiety) and Scale D (Dysthymia). It is important to note that this response style was also noted in the MMPI-II. However, there is no adjustment available to compensate for this self-revealing inclination.

Results on the MCMI-III suggest that Mary is currently unable to keep deep and powerful sources of inner conflict from the need to control everything and the inability to do so. This conflict is causing her much anxiety. She is unable to rid herself of preoccupations with her tension, fearful presentiments, recurring headaches, fatigue, and insomnia, and she is upset by their uncharacteristic presence in her life. Feeling at the mercy of unknown and upsetting forces that seem to well up within her, she is at a loss as to how to counteract them. Related to but beyond her characteristic

level of emotional responsivity, Mary has been confronted with an event ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and events (March 17, 2012 and April 16, 2012) in which she was exposed to a severe threat to her life. Currently the residuals of these events appear to be persistently re-experienced with recurrent and distressing recollections, such as cues that resemble or symbolize an aspect of the traumatic events. Where possible, she seeks to avoid such cues and recollections. Where they cannot be anticipated and actively avoided, as in dreams or nightmares, she may become terrified, exhibiting a number of symptoms of intense anxiety. Other signs of distress include difficulty falling asleep, outbursts of anger, panic attacks, hypervigilance, exaggerated startle response, or a subjective sense of numbing and detachment.

*Integration of Data*

Mary has experienced a great deal of traumatic experiences throughout her life. The diagnostic criteria for the Diagnostic Statistic Manual's Fifth Edition (DSM-V) identifies the trigger to Post-traumatic Stress Disorder (PTSD) as exposure to actual or threatened death, serious injury, or sexual violation. The exposure must result from one or more of the following scenarios, in which the individual directly experiences the traumatic event; witnesses the traumatic event in person; learns that the traumatic event occurred to a close family member or close friend (with the actual or threatened death being either violent or accidental); or experiences first-hand repeated or extreme exposure to aversive details of the traumatic event.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ On March 17, she was arrested and witnessed a fellow arrestee break her wrists from the handcuffs. While in police custody, she was denied her medication which resulted in two seizures. On April 16, 2012 she had a seizure in the police wagon. She was denied immediate medical attention by the police.

In addition to the occurrence of a traumatic event or events as described above, the DSM-V second criterion requires the persistent re-experiencing of the event in one of several ways: thoughts or perception, images, dreams, illusions or hallucinations, dissociative flashback episodes, intense psychological distress or reactivity to cues that symbolize some aspect of the event. As previously noted, Mary has dreams about being locked in cells and

perceives that the she is going to be arrested whenever she sees a police officer.

The third criterion involves avoidance of stimuli that are associated with the trauma and numbing of general responsiveness, as determined by the presence of one or both of the following: Avoidance of thoughts, feelings, or conversations associated with the event; and avoidance of people, places, or activities that may trigger recollections of the event. According to Mary, she has great difficulty in leaving her apartment. Throughout the clinical interview, Mary had great difficulty in discussing the traumatic events in her life.

The fourth criterion is two or more of the following symptoms of negative alterations in cognitions and mood associated with the traumatic event(s): Inability to remember an important aspect of the event(s); persistent and exaggerated negative beliefs about oneself, others, or the world,; persistent, distorted cognitions about the cause or consequences of the event(s); persistent negative emotional state; markedly diminished interest or participation in significant activities; feelings of detachment or estrangement from others; and persistent inability to experience positive emotions. Mary's performance on the MCMI-III clearly indicates that she is unable to rid herself of preoccupations with her tension, fearful presentiments, recurring headaches, fatigue, and insomnia, and she is upset by their uncharacteristic presence in her life. Feeling at the mercy of unknown and upsetting forces that seem to well up within her, she is at a loss as to how to counteract them.

The fifth criterion is marked alterations in arousal and reactivity, as evidenced by two or more of the following: irritable behavior and angry outbursts; reckless or self-destructive behavior; hypervigilance; exaggerated startle response; concentration problems; and sleep disturbance. Mary's performance on the objective testing, behavioral observations, and clinical interview indicate that she is experiencing high levels of distress which is marked by difficulty in falling asleep, outbursts of anger, panic attacks, hypervigilance, exaggerated startle response, and a subjective sense of numbing and detachment (See, MCMI-III results).

### Conclusion

While it may be difficult to parse out which traumatic event in Mary's life is responsible for her current level or distress, there is an abundance of research that demonstrates that those who are exposed to an initial trauma are at risk for additional trauma exposure (Duckworth and Folette, 2012). Moreover, development of PTSD after an initial traumatic event may be one of the strongest risk factors associated for exposure to subsequent trauma (Rissser, Hetzel-Riggin, Thomsen & McCanne, 2006). While this may seem counterintuitive, the symptoms of PTSD can increase the likelihood that a person may unwittingly place herself in harm's way of another traumatic event. For example, detachment, emotional numbing and "shutting down" are symptoms of those who suffer with PTSD (Dunmore, Clark, and Ehlers, 2001). In the case of Mary, her coping mechanism in dealing with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was to emotionally numb herself and remain hyper-vigilant. These characteristics made her more susceptible to experiencing PTSD, especially in the context of being arrested.

No Doubt Mary initially suffered with PTSD when ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The perception of powerlessness ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Finkelhor & Brown, 1985). Feelings of powerlessness, lack of control and self-blame are all factors that increase the context of repeated exposure and psychopathology (Duckworth and Follette, 2012). Mary's childhood feelings of powerlessness, fearfulness, and blame were rekindled by the physicality of both arrests as well as when she pleaded with the police to give her Lamictal, her anticonvulsant medication. It is my opinion, which is based on Mary Tardiff's clinical interview, her behavioral observations, the review of her deposition, the review of her medical records, and her objective psychological testing that the violent physical arrests as described in the body of this report, the lack of medical attention by the police and her subsequent seizures are what currently render Mary Tardif traumatized, faced with great difficulty in her daily functioning.



### Diagnosis

309.81 Post-Traumatic Stress Disorder

296.30 Major Depressive Disorder, NOS

300.02 Generalized Anxiety Disorder

Respectfully Submitted,

*[signature: Robert Goldman]*

Robert Goldman, JD, Psy.D.

## Table of References

American Psychiatric Association, (2013). Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

Dunmore, E., Clark, D. M., & Ehlers, A. (2001). *A prospective investigation of the role of cognitive factors in persistent posttraumatic stress disorder (PTSD) after physical or sexual assault*. Behaviour Research and Therapy, 39, 1063–1084.

Finkelhor, D. & A. Brown. (1985). *The traumatic impact of Child Sexual Abuse: A conceptualization.* American Journal of Orthopsychiatry, 55 (October).

Retraumatization: Assessment, Treatment, and Prevention (2012) Edited by Melanie P. Duckworth, Victoria M. Follette (Editor) Taylor and Francis Group, LLC, Manhattan.

Risser HJ, Hetzel-Riggin MD, Thomsen CJ, McCanne TR. (2006). *PTSD as a mediator of sexual revictimization: the role of reexperiencing, avoidance, and arousal symptoms* Journal of Trauma Stress. 2006 Oct;19(5):687-98.

ROBERT GOLDMAN, PSY.D
PSYCHOLOGIST
283 COMMACK ROAD
COMMACK, NEW YORK 11725
631-499-7500

December 14, 2014

Please be advised that within the last four years I have testified in the following case(s)

People v. John Egan

Suffolk County Court

The Honorable Martin Efman

730 Hearing

P3588

*Robert I. Goldman, Psy.D. - Page 1*

# Robert I. Goldman, J.D., Psy.D.
## Attorney and Licensed Psychologist
283 Commack Road
Commack, New York 11725
(631) 499-7500
Rgoldy@aol.com

## Curriculum Vitae

### EDUCATION

Doctor of Psychology (Psy.D.), School-Community Psychology, 2004
Hofstra University, Hempstead, N.Y.
Cumulative average: 3.97

Juris Doctor (J.D.), 1992
Touro College Jacob D. Fuchsberg Law Center, Huntington, N.Y.
Class rank: Top 15%

B.A., English/ Psychology, 1989
Union College, Schenectady, N.Y.

### LICENSURE/CERTIFICATIONS

Admitted in New York State Appellate Division, Second Dept., Feb. 1993
Admitted in Federal Court, Eastern and Southern Districts
New York State Licensed Psychologist: No. 68-016477

### TEACHING AND LECTURE EXPERIENCE

Goldman, R.I (2001). *The Mental Disease or Defect Defense.* Presented at the Conference on Criminal Law and Psychology, St. Petersburg, Russia.

Goldman, R.I. (Summer, 2002). *Psychopathology and Terrorism.* Presented at the Conference on Modernizing Criminal Justice, London, England.

Goldman, R.I. (Fall 2004). The Treatment of Parental Alienation Syndrome. Presented at the Suffolk County Bar Association, Hauppauge, New York.

Goldman, R.I (Fall 2004). *The New IDEA: Its Not Just Resource Room,* Presented at Conference for Reading Disabilities, Manhattan, New York.

Goldman, R.I (Fall 2006). *Juvenile Justice in Suffolk County,* Presented to Mandatory Law Guardian Training.

P3589

*Robert I. Goldman, Psy.D. - Page 2*

Goldman, RI (Winter 2006). *The New IDEA and the Schaeffer Decision,* Presented at the School for the Language Impaired, Glen Cove, New York.

Goldman, R.I. (Fall 2007). *Juvenile Justice, Where Are We Going and Where Have We Been?* Presented to Mandatory Law Guardian Training.

Goldman, R.I (Fall 2009). *Alternative to Incarceration for Adjudicated Youth sponsored by Fight Crimes Invest in Kids.* Presented at a Long Island-Wide symposium.

Goldman, R.I (Winter 2010). *Testifying as a Psychologist in the Courts.* Presented to the Mental Health Professionals at Mercy First.

Goldman, R. I. (Spring 2010), *Practicing as a Restorative Justice Attorney.* Presented to Faculty and Law Students at Touro Law School.

Goldman, R.I. (Spring 2010). *Handling Cases Involving Individuals with Mental Health Issues.* Presented at the Suffolk County Bar Association.

## PROFESSIONAL AFFILIATIONS

Association of Family and Conciliation Courts
American Psychological Association
National Association of School Psychologists
Law and Psychology Association
New York Association of Family and Conciliation Courts
New York Association of School Psychologists
Suffolk County Criminal Bar Association
New York State Defenders Association

## PROFESSIONAL EXPERIENCES

7/13- Current- **Supervising Psychologist**, Suffolk County Mental Health Unit, Riverhead, NY

> Conduct CPL secs.730 and 390 forensic evaluations for jail inmates, provide counseling for incarcerated individuals, monitor suicide watch at Riverhead Correctional Facility, supervise program development for re-entry planning.

10/04-7/12    **Supervising Psychologist, Suffolk County Department of Probation**, Hauppauge N.Y

> Conduct psychological assessments and forensic evaluations to adjudicated juvenile delinquents, and PINS, provided individual and group

P3590

*Robert I. Goldman, Psy.D. - Page 3*

    therapy and provided liaison services to Family Court, Provide supervision to social workers and psychology and law interns, develop psycho-educational programs in the area of delinquency, and conduct research

9/10- Current **Adjunct Professor, St Josephs College,**

Patchogue, N.Y.

    Teach Community Corrections and Restorative Justice to college students

9/10-9/12    **Adjunct Professor Briarcliffe College,**

Bethpage, New York

    Taught Community Corrections, Introduction to Criminal Justice and Sociology of Deviant Behavior to college students

9/09-2012    **Adjunct Professor, Dowling College,**

Oakdale, New York

    Taught college students Cultural Psychology and Psychology of the Self

1/08-present   **Psychological Restorative Solutions, PC.** Director,

    Work with parties in conflict to facilitate a dialogue between them. provide therapy, parent coordination, therapeutic visitations, individual counseling and forensic evaluations

1/95-present   **Robert I. Goldman, Attorney at Law,** Commack, N.Y.
    Private general practice concentrating in criminal and education law.

2004-2011    **Director of Legal Services, The Mediation Center,** Commack, N.Y.

    Provide mediation services in the area of divorce, family, custody, business and partnership disputes.

1/93 to 1/95   **Staff Attorney, District Court, Suffolk County Legal Aid Society**
Central Islip, N.Y.

    Represented indigent clients in all levels of criminal prosecution; wrote motions and memoranda of law; helped establish Domestic Violence

Appointed as an independent forensic evaluator, parenting coordinator, or provider of therapeutic visitation, and/or psychotherapy by the following Justices and Judges:

| | |
|---|---|
| The Honorable David Freundlich | The Honorable Peter G. Dounias |
| The Honorable Carol MacKenzie | The Honorable Andrew Tarontino |
| The Honorable James Quinn | The Honorable Karen Murphy |

*Robert I. Goldman, Psy.D. - Page 4*

The Honorable Ettore A. Simeone  
The Honorable Emily Pines  
The Honorable Martin Efman  
The Honorable Barbara Kahn  
The Honorable Hector LaSalle  
Hearing Examiner Linda Boggio  

The Honorable Joan Genchi  
The Honorable Andrew Crecca  
The Honorable Marc Cohen  
The Honorable Fernando Camacho  
Hearing Examiner Heather James  

## PUBLICATIONS

Goldman, R.I., Ruvolo, V., Pulitizer, L, (2011) No Room For Vengeance in Justice and Healing. *No Vengeance Publishing, Inc.*

Goldman, R.I. (3/23/10). *Community Based Alternatives for Juveniles.* New York Law Journal.

Goldman, R.I. (2004) *The Randomization of Group Contingencies in a Residential Placement Center for Juvenile Delinquents. Dissertation*, Hofstra University.

P3592