*handwritten:* Court Exh. #12
11/21/18
4:00 p.m

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY DOCKET CLIP
2018 DEC 10   AM 10: 52

---

MARY M. TARDIF,

         Plaintiff,

   v.

CITY OF NEW YORK, POLICE OFFICER
MARSHA RUMBLE, POLICE OFFICER
FELIX SCHMIDT, SERGEANT THOMAS
MCMANUS,

        Defendants.

13-CV-4056 (KMW)

---

**VERDICT FORM**

<u>Unidentified Officer and Sergeant Mattera</u>

## A. <u>LIABILITY OF UNIDENTIFIED OFFICER</u>

1. Did Plaintiff prove by a preponderance of the credible evidence that an unidentified NYPD officer assaulted her on March 21, 2012?

   YES _____     NO \_\_X\_\_

2. Did Plaintiff prove by a preponderance of the credible evidence that an unidentified NYPD officer committed battery against her on March 21, 2012?

   YES _____     NO \_\_X\_\_

   Proceed to Question 3 **only** if you answered "Yes" to Question 1 **or** Question 2. If you answered "No" to both questions, go to Section B – Liability of Sergeant Mattera.

3. Did the unidentified officer's acts, described in Question 1 and/or 2, cause injury to Plaintiff?

   YES _____     NO _____

## B. <u>LIABILITY OF SERGEANT MATTERA</u>

1. Did Plaintiff prove by a preponderance of the credible evidence that Sergeant Mattera assaulted her?

   YES _____     NO \_\_X\_\_

2. Did Plaintiff prove by a preponderance of the credible evidence that Sergeant Mattera committed a battery against her?

   YES _____     NO \_\_X\_\_

   Proceed to Question 3 **only** if you answered "Yes" to Question 1 **or** Question 2. If you answered "No" to both questions, go to the next page.

3. Did Sergeant Mattera's acts, described in Questions 1 and/or 2, cause injury to Plaintiff?

   YES _____     NO _____

**C.  <u>DAMAGES:</u>** Complete **Section C – Damages** only if you found that the actions of the unidentified officer and/or Sergeant Mattera described above caused injury to Plaintiff.  If you did not find that the acts of the unidentified officer and/or Sergeant Mattera caused injury to Plaintiff, turn to the next page.

4.  Please state the amount that will fairly compensate Plaintiff for any injury she sustained as a result of the acts of the unidentified NYPD officer and/or Sergeant Mattera.  You should not award damages more than once for the same injury.

Unidentified NYPD officer    $ _____

Sergeant Mattera                     $ _____

<u>Sergeant McManus</u>

**A. <u>LIABILITY</u>**

1. Did Plaintiff prove by a preponderance of the credible evidence that Sergeant McManus violated her Fourteenth Amendment right not to be subjected to excessive force?

    YES _____      NO \_\_X\_\_\_

2. Did Plaintiff prove by a preponderance of the credible evidence that Sergeant McManus commit an assault against her?

    YES _____      NO \_\_X\_\_\_

3. Did Plaintiff prove by a preponderance of the credible evidence that Sergeant McManus committed a battery against her?

    YES _____      NO \_\_X\_\_\_

    Proceed to Question 4 **<u>only</u>** if you answered "Yes" to Question 1, 2, or 3. If you answered "No" to Questions 1, 2, and 3, proceed to the next page.

4. Did any of Sergeant McManus's acts, described in Questions 1, 2, and/or 3, cause injury to Plaintiff?

    YES _____      NO _____

**B. <u>DAMAGES</u>**

5. Please state the amount that will fairly compensate Plaintiff for any injury she sustained as a result of Sergeant McManus's acts. You should not award damages more than once for the same injury. If you find that Sergeant McManus used excessive force, but did not injure plaintiff, you may award nominal damages in the amount of $1.00.

    $ _____

6. If Plaintiff is entitled to punitive damages based on Sergeant McManus's acts, please write the amount you award Plaintiff for punitive damages on the line below.

    $ _____

Lieutenant Destefano and Officer Aminova

## A.  LIABILITY OF LIEUTENANT DESTEFANO

1. Did Plaintiff prove by a preponderance of the credible evidence that Lieutenant Destefano assaulted her?

    YES _____     NO \_\_X\_\_\_

2. Did Plaintiff prove by a preponderance of the credible evidence that Lieutenant Destefano committed a battery against her?

    YES _____     NO \_\_X\_\_\_

    Proceed to Question 3 **only** if you answered "Yes" to Question 1 **or** Question 2.  If you answered "No" to both questions, go to **Section B – Liability of Officer Aminova.**

3. Did Lieutenant Destefano's acts, described in Questions 1 and/or 2, cause injury to Plaintiff?

    YES _____     NO _____

## B.  LIABILITY OF OFFICER AMINOVA

1. Did Plaintiff prove by a preponderance of the credible evidence that Officer Aminova assaulted her?

    YES _____     NO \_\_X\_\_\_

2. Did Plaintiff prove by a preponderance of the credible evidence that Officer Aminova committed a battery against her?

    YES _____     NO \_\_X\_\_\_

    Proceed to Question 3 **only** if you answered "Yes" to Question 1 **or** Question 2.  If you answered "No" to both questions, go to **Section C – Damages** on the next page.

3. Did Officer Aminova's acts, described in Questions 1 and/or 2, cause injury to Plaintiff?

    YES _____     NO _____

**C. <u>DAMAGES</u>**: Complete **Section C – Damages** only if you found that the actions of Lieutenant Destefano and/or Officer Aminova described in questions 1 and/or 2 on the previous page caused injury to Plaintiff.

    1.  Please state the amount that will fairly compensate Plaintiff for any injury she sustained as a result of the acts of Lieutenant Destefano and/or Officer Aminova.  You should not award damages more than once for the same injury.

        Lieutenant Destefano      $ _____

        Officer Aminova          $ _____

<u>Officer Schmidt and Officer Rumble</u>

## A.  <u>LIABILITY OF OFFICER SCHMIDT</u>

1.  Did Plaintiff prove by a preponderance of the credible evidence that Officer Schmidt violated her constitutional rights by acting with deliberate indifference to a serious medical need of Plaintiff's?

YES _____      NO __✗__

2.  Did Plaintiff prove by a preponderance of the credible evidence that Officer Schmidt violated her constitutional rights by causing Plaintiff to endure unconstitutional conditions of confinement?

YES _____      NO __✗__

Proceed to Question 3 **<u>only</u>** if you answered "Yes" to Question 1 or 2.  If you answered "No" to Questions 1 and 2, proceed to **Section B – Liability of Officer Rumble**.

3.  Did Officer Schmidt's acts described in Questions 1 and/or 2 cause injury to Plaintiff?

YES _____      NO _____

## B.  <u>LIABILITY OF OFFICER RUMBLE</u>

1.  Did Plaintiff prove by a preponderance of the credible evidence that Officer Rumble violated her constitutional rights by acting with deliberate indifference to a serious medical need of Plaintiff's?

YES _____      NO __✗__

2.  Did Plaintiff prove by a preponderance of the credible evidence that Officer Rumble violated her constitutional rights by causing Plaintiff to endure unconstitutional conditions of confinement?

YES _____      NO __✗__

Proceed to Question 3 **<u>only</u>** if you answered "Yes" to Question 1 or 2.  If you answered "No" to Questions 1 and 2, proceed to **Section C – Damages**.

3.  Did Officer Rumble's acts described in Questions 1 and/or 2 cause injury to Plaintiff?

YES _____      NO _____

Complete **Section C – Damages** only if you found that the actions of Officer Schmidt and/or Officer Rumble described above in Questions 1 and/or 2 caused injury to Plaintiff.  If you did not find that the acts of Officer Schmidt and/or Officer Rumble caused injury to Plaintiff, do not

complete Section C – Damages, **and instead sign and date your verdict on the bottom of this page.**

## C. DAMAGES

1. Please state the amount that will fairly compensate Plaintiff for any injury she sustained as a result of Officer Schmidt and/or Officer Rumble's acts described above.   You should not award damages more than once for the same injury.  If you find Plaintiff's constitutional rights were violated by the acts of Officer Schmidt and/or Officer Rumble, but Plaintiff was not injured by those acts, you may award nominal damages in the amount of $1.00.

    Officer Schmidt          $ _____

    Officer Rumble           $ _____

2. If Plaintiff is entitled to punitive damages based on the acts of Officer Schmidt and/or Officer Rumble, please write the amount(s) you award Plaintiff for punitive damages on the lines below.

    Officer Schmidt          $ _____

    Officer Rumble           $ _____

**SIGN AND DATE THE VERDICT:**

So say we all, this ____*21*____ day of November, 2018.

_Judith D. Willinger_
Print Jury Foreperson's Name

_[signature]_
Jury Foreperson's Signature

11/2/18  3:40 p.m.
Court Exhibit #11

Judge Woods
The jury has reached
a verdict

Court Exhibit KNF          Congdon Authors Testimony

IBFHTar2                        Mattera - Direct

9  Q. Now, on March 20 of 2012, you started working around

10  12:20 p.m., is that right?

11  A. Maybe 12:30.

12  Q. OK. What was your tour that day?

13  A. It was 12:30 and my tour would have ended at about

14  11:47 p.m.

15  Q. But you wound up working a lot longer that day, didn't you?

16  A. I wound up working longer, yes. I wouldn't say a lot

17  longer.

18  Q. Well, you worked till 5:50 a.m., right?

19  A. Yes.

20  Q. And that was about a 17-hour day?

21  A. Yes, that's correct.

22  Q. And you were assigned to Union Square Park?

23  A. I was redeployed to Union Square Park that evening. I

24  wasn't initially assigned there.

25  Q. Well, you were part of a CRV search, correct?

IBFHTar2                    Mattera - Direct

1    A.   Yes, that's correct.

2    Q.   And CRV stands for critical response vehicle?

3    A.   Yes, that's correct.

4    Q.   And a CRV search is a counterterrorism exercise that's

5    deployed to sensitive locations, correct?

6    A.   Yes, that's correct.

7    Q.   And you were deployed to Union Square Park because of the

8    Occupy Wall Street protest?

9    A.   I was not deployed there initially.  I was redeployed there

10   towards the end of my tour, yes.

11   Q.   The CRV surge was deployed there because of the Occupy Wall

12   Street?

13   A.   Yes.

14   Q.   There wasn't some independent terroristic threat going on?

15   A.   I'm not aware of that information.  I don't know.

16   Q.   What was your understanding as to why the CRV surge was

17   sent to Union Square that night?

18   A.   We were informed we were redeployed there for crowd

19   control.

20   Q.   And you're referring to the Occupy Wall Street protests,

21   correct?

22   A.   Yes, that's correct.

23   Q.   When you arrived at Union Square, you were stationed near

24   the south side of the steps at Union Square Park, correct?

25   A.   South side of the park, yes.

IBFHTar2                    Mattera - Direct

1   Q.  And there's steps on the south side of the park?

2   A.  I believe there's like two sets of steps south of the green

3   area of the park.

4   Q.  That's the general area that you remained in for the

5   duration of your time at Union Square?

6   A.  Yes, that's correct.

7          MS. SMITH:  I'm going to pull up Exhibit 14, which is

8   already in evidence.  I don't know how to do this, but can we

9   clear the screen of the weird markings on there?

10         I don't know if the deputies, if you can clear that

11  that or how I clear the markings that I put on the screen.

12         THE COURT:  To whom are you directing that?

13         MS. SMITH:  To your staff, your Honor.  Now they're

14  clear.  Thank you very much.

15  Q.  So I'm showing you Exhibit 14, which is already in

16  evidence.  Do you recognize this?

17  A.  Yes.  It looks like an aerial view of the southern portion

18  of Union Square Park.

19  Q.  When you were in Union Square Park late on March 20 into

20  March 21 of 2012, please indicate with your finger, you can

21  draw on this document, where you were.

22  A.  (Witness complies.)

23  Q.  OK.  At this time, at the time you'd gotten there, the

24  police had formed a barricade, correct?

25  A.  That -- I'm not sure about that.  I'm not sure.

IBFHTar2                    Mattera - Direct

1   Q.  I'm going to show you what's already in evidence as

2   Exhibit 16, and we can clear the screen of the marking.

3            So this is Plaintiff's Exhibit 16 already in evidence.

4   Do you recognize what this photograph depicts?

5   A.  It looks like one of the sets of steps at Union Square

6   Park.

7   Q.  And in the middle, I'm marking it in red, where I drew, is

8   that a police barricade?

9   A.  Yes.

10  Q.  Please indicate on what side of the barricade you were just

11  prior to encountering Ms. Tardif that night.

12  A.  Do you want me to draw on the screen?

13  Q.  Sure.

14  A.  (Witness indicates.)

15  Q.  You indicated with an arrow that you were to the right of

16  the barricades as we're looking at the photograph, correct?

17  A.  Correct.  I believe this is like an eastward view of the

18  park, so I would have been south of the barricade.

19  Q.  So as we're looking at this photograph, there's like a

20  clump of police officers on the left.  You were on the other

21  side of the barricades, correct?

22  A.  That's correct.

23  Q.  In fact, you were in a middle of a crowd of protesters just

24  prior to encountering my client, correct?

25  A.  I was -- yes, I was among the protesters.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IBFHTar2                              Mattera - Direct

1   Q.   And you could see at some point that there was a commotion,

2   right?

3   A.   Yes.

4   Q.   And then suddenly Ms. Tardif appeared in your field of

5   vision, is that right?

6   A.   Yes, that's correct.

7   Q.   According to you, you saw her take two or three trodding

8   steps?

9   A.   She was running.

10  Q.   So she wasn't taking trodding steps?

11  A.   Looked like she was running.

12  Q.   And how would you describe that as trodding steps?

13  A.   They were like -- it was more like a run.  I mean, it was

14  very -- it was very brief period of time that she was in my

15  field of view.

16  Q.   And it naturally captured your attention because she was in

17  your field of view, is that right?

18  A.   Yes, and because she was running.

19  Q.   Well, you testified earlier that you did give a deposition

20  in this case, is that right?

21  A.   That's correct.

22  Q.   And you were asked questions and you provided answers that

23  were under oath, correct?

24  A.   That's correct.

25          THE COURT:   That's repetitive.  Move to the next.

IBFHTar2                         Mattera - Direct

1          MS. SMITH:  I'm moving to the deposition.  I'm

2    referring counsel and the Court, and we can pull this up, your

3    Honor, if you like, but you also have the copies with you.

4    It's page 108, and the lines are 12 through 15.

5          THE COURT:  Is it on the screen in front of the

6    witness?

7          MS. SMITH:  No, it is not.  Would you like us to do

8    that?

9          THE COURT:  Yes.

10          MS. SMITH:  Tech team, can you pull up the deposition

11   of Mattera, page 108, lines -- you can just pull up page 108,

12   and I'll direct him to the lines.  If you could scroll down

13   just slightly on the document so he can see.  This should not

14   be for the jury to see, just for the witness and for the

15   counsel table.

16   Q.  I'm going to direct your attention to -- and please

17   disregard the markings on the screen -- this is lines 12

18   through 15.

19          And your Honor may I -- should I ask if it refreshes

20   or just read in for impeachment value?

21          THE COURT:  Were you asked this question and did you

22   give this answer.

23          MS. SMITH:  OK.

24   Q.  Were you asked the following question and did you give the

25   following answer that's depicted on lines 12 through 15?

IBFHTar2                          Mattera - Direct

1          May I read that in, your Honor?

2          THE COURT:  Are you quibbling about jogging versus

3    running?

4          MS. SMITH:  Yes.

5          THE COURT:  All right.  Go ahead.

6          MS. SMITH:  I'll start with actually line 13:

7    "Q.  OK.  And you said she was running."

8          This is the question.

9    "She or she ran past?

10   "A.  Well, she took about, from what I saw, it was about two or

11   three trodding steps, jogging steps.  She wasn't just casually

12   strolling by."

13   Q.  Do you remember being asked that question and giving that

14   answer?

15   A.  Yes, I do.

16   Q.  So she -- as you said earlier, she naturally captured your

17   attention because of this behavior?

18   A.  That's correct.

19   Q.  And you didn't see any officers touching Ms. Tardif?

20   A.  I don't recall if I saw any.

21   Q.  You didn't see her touch anyone?

22   A.  From my -- from my viewpoint it looked like she had her

23   hands on the back of the police officer.

24   Q.  So you saw her touching a police officer?

25   A.  Yes, that's correct.

IBFHTar2                        Mattera - Direct

1    Q.   In fact, you claim that she ran right up to a police

2    officer and put her hands on his back, is that right?

3    A.   I would say she placed her hands on his back.

4    Q.   So she was touching both hands on a police officer's back,

5    correct?

6    A.   That's correct.

7    Q.   And you were certain it was a police officer she put her

8    hands on, right?

9    A.   Yes, that's correct.

10   Q.   That was because of the uniform?

11   A.   Yes, and the eight point hat.

12   Q.   And also, it was a male police officer, right?

13   A.   That I can't tell.  I don't remember.

14   Q.   So it could have been a female police officer?

15   A.   Yes.

16   Q.   When you were providing questions in your deposition, you

17   referred to that officer as a male, is that right?

18   A.   Yes.  Well, the hair was short, but it could -- it could

19   have been a female that had short hair, but it just -- it was

20   just an officer with short hair.

21   Q.   That you assumed was male?

22   A.   That I assumed was a male, yes.

23   Q.   And that's the only person that you claim that she put her

24   hands on, is that right?

25   A.   Yes, that's correct.

IBFHTar2                          Mattera – Direct

1   Q.  And of course, you ordered Ms. Tardif immediately to stop

2   that behavior, didn't you?

3   A.  No, I did not give any verbal commands.



10  Q.  You should have given her an order to stop because she was

11  touching a police officer, right?

12  A.  Like I explained previously, in the force continuum, it is

13  not required to give a verbal order before you use physical

14  force.

15  Q.  Well, you did testify earlier that touching a cop under

16  certain circumstances is a crime, right?

17  A.  Yes, that's correct.

18  Q.  So did you tell her to freeze?

19  A.  No, I did not give her any verbal commands.

20  Q.  You didn't tell her to put her hand behind her back?

21  A.  No, I did not.

22  Q.  That she was under arrest?

23  A.  No, I did not.

24  Q.  In fact, you said nothing?

25  A.  That is correct.

IBFHTar2                        Mattera - Direct

1    Q.  And what she was doing was illegal, correct?

2    A.  Like I stated previously, it all depends on the totality of

3    the circumstances.

4          THE COURT:  I think you're beating a dead horse.

5    Let's move on.

6    Q.  And you must have been after that concerned about the

7    officer, right?

8    A.  It didn't look like the officer was affected.

9    Q.  Did you ask him if he was OK?

10   A.  No, I did not.

11   Q.  Did you see if he needed any medical assistance?

12   A.  No, I did not.

13   Q.  Did you find out who that officer was?

14   A.  No, I did not.

15   Q.  In fact, that officer that you claimed Ms. Tardif touched,

16   he didn't say anything to her either, did he?

17   A.  I don't think he realized what was going on.

18   

19

20

21   Q.  What led you to believe he didn't realize what was going

22   on?

23   A.  Because I don't recall him turning around or anything like

24   that.

25          (Continued on next page)

IBF7TAR3                    Mattera - Direct

1   BY MS. SMITH:

2   Q.  So he didn't arrest Ms. Tardif.

3   A.  That I can't tell you if that happened later, but not at

4   that time, no.

5   Q.  And he didn't question her or detain her at that time.

6   A.  Correct.

7   Q.  In fact, you didn't hear that officer speak with her at

8   all.

9   A.  That's correct.

10  Q.  So, in response to Ms. Tardif putting her hands on the back

11  of this police officer, you grabbed her, right?

12  A.  Yes, that's correct.

13  Q.  You grabbed her from behind.

14  A.  Yes.

15  Q.  And you grabbed her by the collar of her shirt?

16  A.  I placed my arms around her triceps.

17  Q.  Did you grab her by the waist of the pants?

18  A.  No.

19  Q.  And you picked her up and you swung her around.

20  A.  No, that's not correct.

21  Q.  At one point she was facing you; is that right?

22  A.  I don't recall that from my memory, but I did see some

23  photos that she -- her body might have contorted after I

24  grabbed her.

25  Q.  Contorted?  Do you mean she was face to face with you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IBF7TAR3                         Mattera - Direct

1   A.  No, it looks like either she might have -- she might have

2   turned a little bit to see what was going on, who had grabbed

3   her, or perhaps from the motion of me trying to pull her off to

4   the left, she might have twisted around more towards my

5   direction, or also possibly the movement of the crowd.  I don't

6   know, like I said, she was running or jogging when I first saw

7   her, and she was probably already off balance, so that could

8   have contributed to it also.

9   Q.  So you grabbed her from behind, and at some point she

10  actually turned at least 180 to face you, correct?

11  A.  I don't know degree amounts.  I don't know.

12  Q.  Well, I'm just going to show just for counsel and the

13  witness Plaintiff's Exhibit 20.

14          Lieutenant Mattera, you can see this, correct?

15  A.  Yes, I see that.

16  Q.  OK.  And you said you reviewed a photo.  Is this the photo

17  that you were discussing that you reviewed?

18  A.  Yes, I did see this photo.

19  Q.  OK.  And do you recognize yourself in the photo?

20  A.  Yes, I do.

21  Q.  And is that a fair and accurate representation of what

22  occurred on that date?

23  A.  That is from the camera's perspective.

24  Q.  But does that fairly depict you on that date?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IBF7TAR3                        Mattera - Direct

1    Q.  And that is Ms. Tardif with whom you're holding on to?

2    A.  I'll take your word on that.  I don't know.  I assume so.

3    Q.  And did you recognize her from that date?

4    A.  I'm sorry.  Can you ask that again.

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████

8           ████████████████████████

9           ██████████████████████████

10   Q.  I'm sorry.  That was the person you had hands on that

11   night, correct?

12   A.  That's correct.

13          MS. SMITH:  Your Honor, I move to admit Plaintiff's 20

14   into evidence.

15          MR. LAX:  No objection, your Honor.

16          THE COURT:  Plaintiff's Exhibit 20 -- is it 27?

17          MS. SMITH:  I think it's 20, your Honor.

18          THE COURT:  Plaintiff's Exhibit 20 is received without

19   objection.

20          (Plaintiff's Exhibit 20 received in evidence)

21          MS. SMITH:  And can we publish this to the jury,

22   please.

23   Q.  And Lieutenant Mattera, can you with your finger mark where

24   you are on this photograph so that the jury can see, please.

25   And the individual that you are holding on to, that is

IBF7TAR3                        Mattera - Direct

1    Ms. Tardif, correct?

2    A.   Yes.

3    Q.   And you two are face to face in this photograph, correct?

4    A.   I don't believe so.  I think her face is -- she is maybe

5    facing to my right a little bit, based off of her hair.

6    Q.   But you are essentially chest to chest, right?

7    A.   I wouldn't say that.

8    Q.   You wouldn't describe that that's the front of her body

9    that's parallel to the front of your body?

10   A.   She looks a little more -- she looks a little more like at

11   a 70 degree angle.

12   Q.   I'm going to mark now -- this is the rear of her body, am I

13   correct?

14   A.   Yes, that's correct.

15   Q.   And this is the front of her body.

16   A.   It's hard to say.  The sweater is very loose, so you can't

17   really tell from that which way her upper body is facing.

18   Q.   But we know this is the back, right?

19   A.   That's correct.

20   Q.   And is it your testimony that you never saw her face that

21   day?

22   A.   That's correct.

23   Q.   Even as you sit here now, you don't believe you saw her

24   face that day?

25   A.   That's correct.

IBF7TAR3                        Mattera - Direct

1          MS. SMITH:  I'm going to show just to the witness and

2    to counsel Plaintiff's Exhibit 15.  And if we could clear the

3    markings.  I am not sure how to do that from here.

4    Q.  Lieutenant Mattera, do you recognize Ms. Tardif in this

5    photograph?

6    A.  Yes.

7    Q.  And is that the woman that you grabbed on March 21st of

8    2012?

9    A.  I only know what she looks like from when I saw her at

10   deposition.



15   A.  Because the first time I saw her face was at deposition.

16   Q.  And after you grabbed his Tardif, you pushed her; is that

17   right?

18   A.  That is incorrect.

19   Q.  You didn't throw her to the ground?

20   A.  That is incorrect.

21   Q.  You actually lifted her feet off the ground and threw her

22   to the side, correct?

23   A.  No, that isn't correct.

24   Q.  Now, it's your claim that she actually fell, right?

25   A.  Yes, that is correct.

IBF7TAR3                          Mattera - Direct

1   Q.  And that you couldn't manage to hold her up?

2   A.  Yes, that's correct.



11  Q.  Was Ms. Tardif so heavy that you couldn't hold her up?

12  A.  I recall when I grabbed her that she was heavier than I

13  expected.

14  Q.  And you tried to prevent her fall, right?

15  A.  I don't think I ever actually had a good grip on her.

16  Q.  So she just slipped to the ground?

17  A.  Yes.

18  Q.  Did you try to break her fall?

19  A.  No, I didn't have a chance to.

20  Q.  Because she fell away from your grasp too quickly?

21  A.  Yes, that's correct.

22          MS. SMITH:  I'm going to display Exhibit 22 which is

23  already in evidence, and so we will publish that to the jury,

24  and I'm going to have us start at 23 seconds, and we will be

25  going through approximately 33 seconds, and we're going to be

IBF7TAR3                          Mattera - Direct

1    going in slow motion frame by frame with audio, but we're doing

2    frame by frame, and I don't know that we're going to hear it

3    anyway.

4            So we're going to pause it and just advance from here

5    frame by frame, please, and I'll tell you when to stop.

6            Stop.

7    Q.  Lieutenant Mattera, I'm going to direct your attention to

8    this area as we go frame by frame, OK?

9    A.  OK.

10           MS. SMITH:  So please advance.  And stop.

11   Q.  Do you recognize yourself on the video?

12   A.  Yes.

13   Q.  And that is you grabbing on to Ms. Tardif, correct?

14   A.  Correct.

15   Q.  And throwing her to the ground.

16           MR. LAX:  Objection.

17           THE COURT:  If you can answer yes or no.

18   A.  That is incorrect.

19   Q.  Is that when you were trying to help her?

20   A.  That's when I was unable -- that's when I didn't realize

21   how heavy she was, and I was not prepared to hold on to her,

22   and that's when she fell.

23           MS. SMITH:  And let's advance forward again frame by

24   frame.  And stop.

25   Q.  So, this depicts Ms. Tardif after she fell on the ground,

IBF7TAR3                         Mattera - Direct

1    correct?

2    A.  Correct.

3    Q.  And at that point you realized that she had gone to the

4    ground.

5    A.  That's correct.

6    Q.  And you were concerned that she was hurt.

7    A.  Yes, I was.

8    Q.  And you thought that she may have hurt herself.

9    A.  That's correct.

10   Q.  And so you naturally went to check on her, right?

11   A.  No, I was not able to.

12   Q.  And you went over and bent over to see if she was OK.

13   A.  No, I did not.

14   Q.  You then must have called for medical?

15   A.  No, I didn't.

16   Q.  Did you ask any other officers around how she was?

17   A.  No, I did not.

18   Q.  And in fact what you did was you just walked right away; is

19   that correct?

20   A.  No, that's not correct.

21          MS. SMITH:  Let's go back about five seconds, and we

22   will play through again.  Good.  You can go through, and I will

23   tell you when to pause and go frame by frame.  Stop.  And go

24   through frame by frame now.

25   Q.  I want you to keep an eye on where you are and tell me if

IBF7TAR3                    Mattera - Direct

1   you do not in fact walk off.

2            OK, stop.

3            And you in fact took a right and walked in the other

4   direction; is that right?

5   A.  No, that's not correct.

6   Q.  Well, according to you the crowd shifted, right?

7   A.  Yes.

8   Q.  And the crowd shifted so that you weren't able to walk over

9   to help Ms. Tardif.

10  A.  Yes, that's correct.

11  Q.  And you wanted to check your surroundings to make sure

12  everything was safe before you helped her, right?

13  A.  Yes.  I lost my bearing because I couldn't normally see the

14  landmarks that I saw around me, so it took me a few seconds to

15  get my spacial orientation back.

16  Q.  You lost your bearings after she fell?

17  A.  Well, when the crowd shifted, I didn't know where I was for

18  a few seconds.

19  Q.  So the crowd shifting, is that depicted in this video?

20  A.  I don't believe so.

21  Q.  And how did the crowd shift that made you lose your

22  bearings?

23  A.  People started moving back and forth in different

24  directions.

25            MS. SMITH:  And we're just going to go back a few

IBF7TAR3                          Mattera - Direct

1   seconds.  We will advance one more time.  OK, stop.  I'm sorry,

2   just go back a few frames.  OK, good.  Advance frame by frame

3   again.

4   Q.  And so you didn't immediately bend over right then to check

5   on her.

6   A.  No, I did not.

7   Q.  And that's because the crowd shift happened right then to

8   prevent you from helping her.

9   A.  So, at first I didn't realize what had happened because it

10  happened so suddenly.  And once I realized what happened, the

11  crowd shifted.  If you look I'm actually shorter than average

12  from the people around me, so once the crowd shifted, like I

13  said, I couldn't see her right away so I didn't know where I

14  was, and it took me a few seconds to get my bearings.

15  Q.  Well, there is a large circle around Ms. Tardif, correct?

16  A.  Yes.

17  Q.  And you weren't aware that that was the person who you

18  claim fell?

19  A.  It took me a few seconds, but then I did realize it, yes.

20  Q.  So then you went over and tried to help.

21  A.  No, I did not.

22  Q.  And that's when you called for an ambulance?

23  A.  No, I did not.

24  Q.  And is that when you told the police officer what happened

25  so that they could write up an aided report?

IBF7TAR3                          Mattera - Direct

1    A.  No, I did not.

2    Q.  And you must have drafted the aided report yourself then,

3    right?

4    A.  No.

5    Q.  So where did you write down what you saw happen?

6    A.  I did not write that anywhere.

7    Q.  You didn't write it down in your memo book?

8    A.  No, I did not.

9    Q.  And you did not write it down in an aided report?

10   A.  That's correct.

11   Q.  Even though that's what is required by NYPD, correct?

12          MR. LAX:  Objection.

13          THE COURT:  Overruled.

14   A.  No, that would not be the duty of a sergeant to write down

15   that information in a memo book unless the sergeant is

16   preparing aided report.

17   Q.  But it would be your duty to disclose to someone what

18   happened so that proper care could be rendered, right?

19   A.  I would say not necessarily.  I don't think it would have

20   affected the care.

21   Q.  But it's the best practice, isn't it?

22   A.  Yes, I believe so.

23   Q.  So you didn't do what you were supposed to do.

24   A.  I didn't follow the best practice according to what you

25   just said.  That's not necessarily what I'm supposed to do.

IBF7TAR3                          Mattera - Direct

1          MR. LAX:  Objection.

2    Q.  But the best practice is outlined by NYPD, correct?

3          MR. LAX:  Objection.

4          THE COURT:  Overruled.  Which best practice?

5          MS. SMITH:  The best practice of recording how a

6    civilian gets injured.

7    A.  Well, like I said before, my experience of filling out an

8    aided report is just a description of the injuries and not

9    necessarily the circumstances of how it happened.

10   Q.  And so again you did speak to someone about what happened

11   so a proper aided report could be filled out.

12   A.  I don't believe that would have been -- the proper aided

13   report could have been filled out, I think.

14   Q.  That's because you never did render the aid, right?  You

15   just saw what happened.

16   A.  I didn't personally render aid, correct.

17   Q.  And that's because you got -- you lost your bearings,

18   right?

19   A.  Yes, that's correct.

20   Q.  Because were you so short?

21   A.  Among other factors, yes.

22   

23

24

25

IBFHTar4                    Mattera - Direct

1    considered in rendering your verdict here, and you must not

2    allow the presence of the service dog to influence you in any

3    way throughout the trial and when you go in to deliberate and

4    reach your verdict.  Thank you.

5              We're ready to proceed.

6              MS. SMITH:  OK.  I'm going to queue this up with

7    Plaintiff's -- the exhibit that's been identified, but it's not

8    in evidence yet, Plaintiff's 10, and that would be displayed

9    for the witness and for the Court and for the attorneys.

10   Q.  So, lieutenant, you testified earlier that you did not

11   personally fill out an aided report about Ms. Tardif's injury,

12   correct?

13   A.  Yes, that's correct.

14   Q.  But you are familiar with aided reports?

15   A.  Yes, that's correct.

16   Q.  And I'm directing your attention to what's been marked for

17   identification as Plaintiff's 10.  Do you recognize, generally,

18   this document?

19   A.  Yes.

20   Q.  What do you recognize it to be?

21   A.  This seems to be like a computer printout of an aided

22   report.

23   Q.  Directing your attention to the top of the form, and I've

24   indicated, do you recognize whose name is indicated in this

25   form?

IBFHTar4                    Mattera - Direct

1    A.  Yes.

2    Q.  And this is created in the regular course of business for

3    NYPD, is that correct?

4    A.  That's correct.

5             MS. SMITH:  I move to admit Plaintiff's 10 into

6    evidence.

7             MR. LAX:  No objection.

8             THE COURT:  Plaintiff's Exhibit 10 is received without

9    objection.

10            (Plaintiff's Exhibit 10 received in evidence)

11            MS. SMITH:  And we'll publish this to the jury,

12   please.

13   Q.  So who is -- this aided report is for Ms. Tardif, correct?

14   A.  Yes.

15   Q.  It indicates her name and her age?

16   A.  Yes.

17   Q.  And indicates approximately when this incident took place,

18   correct?

19   A.  Correct.

20   Q.  Which is on March 21, approximately 4 o'clock a.m.,

21   correct?

22   A.  Correct.

23   Q.  And this document was filled out by an Officer

24   Meritz-Saccente, right?

25   A.  Yes.

IBFHTar4                        Mattera - Direct

1   Q.  Can you mark where you see the officer's name on the form.

2   A.  (Witness complies.)

3   Q.  And your name does not appear in this form, right?

4   A.  That's correct.

5   Q.  And there is a narrative section of the form that

6   identifies how the injury occurred, right?

7   A.  Yes, correct.

8   Q.  Can you mark for the jury where that section is on the

9   form.

10  A.  (Witness complies.)

11  Q.  Thank you.

12        For the jury, please indicate what's written in the

13  narrative section of the aided report with respect to

14  Ms. Tardif's jury injuries.

15  A.  I'm sorry.  You want me to read that?

16  Q.  Yes, I do.

17  A.  Says, "CPR not administered during an altercation when a

18  civilian woman fell and struck her head on pavement as well as

19  turned her ankle in process of fall."

20  Q.  And that is not what occurred, though, correct?

21  A.  Correct.

22  Q.  Did you tell Meritz-Saccente to put that in the report?

23  A.  No, I did not.

24  Q.  Did you speak with anyone about what happened?

25  A.  I did not.

IBFHTar4                    Mattera - Direct

1   Q.   And you saw EMTs come to render treatment, correct?

2   A.   Yes.

3   Q.   And when they came, you spoke with them?

4   A.   I did not.

5   Q.   Where were you when they came?

6   A.   I was amongst the crowd.

7   Q.   But you saw them?

8   A.   I did, yes.

9   Q.   And yet you told them nothing?

10  A.   Correct.

11  Q.   You're aware that officers did speak with EMTs, right?

12  A.   I was not aware, no.  I'm assuming so.  If the aided

13  report's filled out, they would have spoke to them.

14  Q.   And if the aided report says what it does in the narrative

15  section, it's wrong, right?

16  A.   Yes, that's correct.

17  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

18  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆?

19  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

20  ▆▆▆▆▆▆▆▆▆▆▆▆▆.

21  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

22  ▆▆▆▆▆▆▆▆▆

23  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

24  ▆▆▆▆▆▆▆▆▆▆▆

25            THE COURT:  Did you throw Ms. Tardif to the ground?

IBFHTar4                        Mattera - Cross

1              THE WITNESS:  I did not, Judge.

2              MS. SMITH:  Thank you.

3    CROSS-EXAMINATION

4    BY MR. LAX:

5    Q.  All right.  Good afternoon, Lieutenant Mattera.

6    A.  Good afternoon.

7    Q.  OK.  Could you just explain to the jury, why did you take

8    hold of the plaintiff on March 21, 2012?

9    A.  March 21, 2012, I was in Union Square Park doing crowd

10   control.  We were redeployed there from our CRV deployment.  We

11   were redeployed approximately 11 p.m.

12             THE COURT:  May I ask you to slow down a bit for the

13   court reporter.

14   Q.  If I can just ask a follow-up question.  The precise

15   moment --

16             THE COURT:  He hasn't finished.

17             MR. LAX:  I'm sorry, your Honor.

18             THE WITNESS:  May I proceed?

19             THE COURT:  Yes, we were redeployed there.

20   A.  Yeah, we were redeployed to Union Square Park with

21   instructions to stay in the south side of the park.

22   Q.  OK.  There came a point when you encountered the plaintiff,

23   right?

24   A.  Yes, that is correct.

25   Q.  What did you see?  What happened?  What was the first thing

IBFHTar4                        Mattera - Cross

1   you saw the plaintiff do?

2   A.   I was standing there, and I was -- it was about a line of

3   protesters and at least one police officer in my field of view,

4   and there was some type of action going on on the opposite side

5   of them that they were all facing the same direction.  As I was

6   looking towards this, I see this figure come from my left side

7   taking about like two or three running steps into my field of

8   view, run directly behind a uniformed police officer that was

9   standing there, and she put her hands up like this and --

10  Q.   Just for the record, you're holding your hands up about --

11  both of your elbows are folded, your palms are forward, and

12  they're in front of your shoulders, correct?

13  A.   That's correct.

14  Q.   I'm sorry.  Continue.

15  A.   Yes.  It looked as if she was about to run into the back of

16  this police officer, so she put her hands up to catch herself

17  or steady herself.  And at that point I just instinctively

18  reacted, and I went up to her and I just -- I grabbed her on

19  both arms in approximately the triceps area, and I went to pull

20  her off to the side, away from him.  And I remember thinking to

21  myself that she was a lot heavier than I expected, and I don't

22  think I ever got a good grip on her.  And during this motion, I

23  felt her weight being pulled down, and I lost grip of her and

24  she fell down.

25  Q.   Could you just explain to the jury how the plaintiff fell.

IBFHTar4                    Mattera - Cross

1    A.  It looks like from the picture she might have fell on her

2    bottom.

3    Q.  What did you actually experience at that time?

4    A.  At the time I was -- I was a little confused.  I didn't --

5    it looked like -- I didn't realize that she had fallen right

6    away.  I still thought she might have been right there in front

7    of me.  And then when, you know, the crowd shifted, some of the

8    people moved around, I kind of lost my bearing.  I didn't know

9    exactly where I was for a few seconds, and then finally when I

10   was able -- when I figured out where I was, I saw there had

11   been, like, a crowd of people off to my left where she fell.

12   And I saw at least one uniformed police officer standing there,

13   which I recognized by his eight-point hat, and he was standing

14   there amongst the crowd.  I heard somebody say, "Call a bus,"

15   and that's how I knew that somebody was rendering her aid.

16   Q.  Just going back a second to -- you said that based on the

17   photo like she -- she went bottom first down, I think you said?

18   A.  Yes.

19   Q.  What direction did her body move at that point?

20   A.  To the left.

21   Q.  And did her body go outward?  Did it go down?  Her actual

22   physical body, how did it travel to the ground?

23   A.  I believe it went down and outward a little bit.

24   Q.  And now, you mentioned that the crowd, there was a crowd

25   that caused you to lose your bearings, correct?

IBFHTar4                    Mattera - Cross

1   A.  Yes.

2   Q.  How far away from the location where the plaintiff fell

3   were you moved?

4   A.  Maybe between, like, about 5 and 10 feet.

5   Q.  You just described hearing someone call for a bus?

6   A.  Yes.

7   Q.  Can you explain -- well, withdrawn.

8           Did there come a time that you learned that the

9   plaintiff was receiving medical treatment?

10  A.  Yes.

11  Q.  How long after the actual confrontation with plaintiff did

12  that occur?

13  A.  A few seconds later.

14  Q.  What is it that indicated to you that she was receiving

15  medical care?

16  A.  I heard somebody say, "Call a bus."

17  Q.  What is a bus?

18  A.  A bus is police slang for an ambulance.

19  Q.  And did you ever see either an ambulance or EMTs arrive?

20  A.  Yes, I did.

21  Q.  How long after that?  How long after the incident did you

22  see that?

23  A.  Maybe -- maybe five minutes.

24  Q.  Why didn't you ever go and try and get plaintiff an

25  ambulance or speak to anyone over there?

IBFHTar4                        Mattera - Cross

1    A.  I didn't feel it was necessary.  As a sergeant, I would

2    have assigned a police officer to render aid.  If we had an

3    aided case, I would have assigned a police officer to go and

4    handle the aided case.

5    Q.  And as far as you were aware, was someone handling the

6    aided case?

7    A.  Yes.

8    Q.  OK.  You were shown a copy of the aided card printout,

9    correct?

10   A.  Yes.

11   Q.  The officer who's listed there, Meritz-Saccente, do you

12   know him?

13   A.  I do not.

14   Q.  Did you ever work with that officer?

15   A.  No, I did not.

16   Q.  Did you speak to that officer about what had occurred with

17   plaintiff?

18   A.  No, I did not.

19            MR. LAX:  Just one moment, your Honor.  I'm almost

20   done.

21            THE COURT:  Sure.

22   Q.  Now, at the time you took hold of plaintiff, what was your

23   intention?

24   A.  My intention was to pull her off to the side and get her

25   away from the police officer that she was running into.

IBFHTar4                        Mattera - Cross

1   Q.  Did you want to place her under arrest at the point that

2   you tried to move her off to the side?

3   A.  No, I did not.

4   Q.  Can you explain to the jury why that is.

5   A.  Because based on a totality of the circumstances, I didn't

6   feel like she knew what she was doing.  I don't think she

7   realized that she ran up right behind a police officer.  I

8   think she was running up to see what was going on, on the other

9   side of that group of people, and I felt like it was just a

10  coincidence that she had just run up -- the one person that she

11  ran behind was a uniformed police officer.

12  Q.  Why did you want to prevent her from putting hands on a

13  uniformed police officer?

14  A.  At the time I didn't know what her intentions were.  I

15  didn't know if they were malicious, so I kind of just

16  instinctively reacted when I went and grabbed her.  But based

17  on a totality of the circumstances, my -- my thought process

18  was more likely than not that she didn't realize what she was

19  doing.

20  Q.  So is it fair to say that you were trying to prevent the

21  situation from further escalating?

22  A.  Yes, that's correct.

23           MR. LAX:  Just one second, your Honor.

24  Q.  All right.  Now, obviously, the plaintiff fell to the

25  ground?

IBFHTar4                    Mattera - Redirect

1    A.  Yes, that's correct.

2    Q.  Was it your intention that she go to the ground?

3    A.  No, it was not.

4    Q.  When you tried to move her off, what were you hoping to

5    have happen?

6    A.  I was hoping to pull her off to the side and -- and talk to

7    her and find out what she was doing and hopefully get a

8    satisfactory explanation from her.

9         MR. LAX:  All right.  No further questions, your

10   Honor.

11   REDIRECT EXAMINATION

12   BY MS. SMITH:

13   Q.  Lieutenant, you just testified that you grabbed Ms. Tardif

14   because she was about to run into the officer, right?

15   A.  Correct.

16   Q.  But then you previously testified today that she actually

17   put her hands on that officer, right?

18   A.  Right, those are two different things.

19   Q.  So did she make physical contact?

20   A.  I believe so.  From my viewpoint, it appeared that she had

21   just placed her hands on his back.

22   Q.  And you could have used less force to accomplish your goal,

23   right?

24        MR. LAX:  Objection.

25        THE COURT:  I'll permit it.

IBFHTar4                    Mattera — Redirect

1   A.  I don't believe so.

2   Q.  So this, your testimony is, is the least amount of force

3   necessary to accomplish your goal?

4          MR. LAX:  Objection.

5          THE COURT:  I'll permit it.

6   A.  It would have been the minimal amount of force that I

7   needed to use, yes.

8   Q.  And you testified that after she hit the ground, you became

9   confused and disoriented, right?

10  A.  I lost my orientation of where I was.

11  Q.  Do you have any type of medical condition that causes

12  disorientation or vertigo?

13  A.  No, it wasn't anything like that.



18  Q.  And you said that when you heard that a bus was being

19  called, you figured that someone had already handled this aided

20  case, right?

21  A.  I knew that somebody was rendering her reasonable aid.

22  Q.  And you didn't know who was doing that?

23  A.  I knew it was a police officer.

24  Q.  But you didn't ask anyone to actually fill out the aided

25  card, right?

IBFHTar4                              S. Shockley – Direct

1   A.   Correct.

2              MS. SMITH:   Thank you.

3              MR. LAX:   Nothing further, your Honor.

4              THE COURT:   All right.   Thank you very much.   You may

5   step down.



Ibj6tar4                     Tardif - direct



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Q.  After you moved, what happened?

Ibj6tar4                         Tardif - direct

1   A.  I decided to look move to my left and I was met with an

2   officer who grabbed me.

3   Q.  Let's talk about that.

4          Where did this officer come from?

5   A.  A line of other police officers that were a little further

6   back.

7   Q.  Was that to your right or to your left?

8   A.  To my left.

9   Q.  You said he grabbed you.  How did he grab you?

10  A.  He grabbed me here on my upper shoulder-ish area around my

11  job shirt.

12  Q.  At what pace did the officer approach you?

13  A.  He was moving really quickly.

14  Q.  And can you describe how he approached you?

15  A.  He came out and towards me and then he grabbed me.

16  Q.  Can you demonstrate for the jury how he grabbed you?

17  A.  Like that.

18          MR. KRIEGER:  Your Honor, may the record reflect that

19  the witness put her hands on her collar and pushed them down.

20  Q.  After the officer grabbed you, what did he do?

21  A.  He -- I looked at him because I didn't know if I was under

22  arrest or not and he looked mad, but he didn't say anything to

23  me and then he like twisted and threw me away from him.

24  Q.  You said twisted.  What direction did your body go?

25  A.  Out and away.

Ibj6tar4                     Tardif - direct

1    Q.  And after he twisted you, what did he do?

2    A.  I am not sure what he did.

3    Q.  What did he do to you after he twisted you?

4    A.  He twisted and threw me, but I don't know where he went

5    after.

6    Q.  Where did you end up when he threw you?

7    A.  On the ground.

8    Q.  What part of your body hit the ground?

9    A.  My feet were out from under me so my bottom hit first.  And

10   then because I had momentum, I had bounced.

11   Q.  When the officer grabbed you, did you see the officer's

12   face?

13   A.  Yes.

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████

17   ██████████████████████████████████

18   ██████████████████████████████████████████

19   ████████████████

20   Q.  Once your body hit the ground, how did you feel?

21   A.  I felt upset and scared and probably, I mean, a little

22   angry but mostly terrified because I had a huge pain in my head

23   so I wasn't really thinking about anything else.

24   Q.  You say that you felt a pain in your head.  Can you

25   describe intensity of that pain?

Ibj6tar4                        Tardif - direct

1    A.  It was like a hot pain.  If I was asking a patient if you

2    could describe for me the pain between one and ten, it was like

3    a 9.5 in the back of my neck.

4    Q.  Can you describe the officer who threw you to the grown?

5    A.  Yes.  He was a shorter white male with brown hair.  He has

6    light lies and a big -- bigger nose and he was a little stalky.

7    Q.  Have you been able to identify the officer who threw you to

8    the ground?

9    A.  The city has, yes.

10   Q.  Who is that officer?

11   A.  Officer Mattera.

12   Q.  Sergeant Mattera?

13   A.  Sergeant Mattera.

14   Q.  Before he threw you to the ground when, if ever, you had

15   seen Sergeant Mattera?

16   A.  I hadn't.

17   Q.  Before Sergeant Mattera threw you to the ground, what had

18   you been doing?

19   A.  I had gotten back up to my feet after being pushed over.

20

21

22

23   Q.  How long after you stood up, did Sergeant Mattera pick you

24   up?

25   A.  It was only seconds.

Ibj6tar4                          Tardif – direct

1    Q.  Prior to Sergeant Mattera picking you up, what physical

2    contact did you have with him?

3    A.  I didn't have any physical contact.

4    Q.  Can you tell the jury prior to Sergeant Mattera picking you

5    up what interactions you had with any other officer?

6           MS. GOYKADOSH:  Objection.

7           THE COURT:  I will permit it.

8    A.  I had not had any physical contact with any other officer.

9    Q.  You heard Sergeant Mattera testify that prior to his

10   interaction with you, he thought you had put your hand on

11   another officer or about to put your hand on another officer.

12          What is your reaction to that testimony?

13          MS. GOYKADOSH:  Objection.

14          THE COURT:  I will permit it.

15   A.  I had not put my hands on any other officer.  We're

16   actually trained in the 18-hour medic training that you don't

17   put your hands on officers and if you're close to an officer,

18   you put them up.

19   Q.  How far were you from any officer when Sergeant Mattera

20   grabbed you?

21   A.  I would say around six or seven feet.

22   Q.  When sergeant Mattera grabbed, you how were you holding

23   your hands?

24   A.  When he grabbed me, I didn't know if I was under arrest or

25   not so I put my hands out and in front of me so I didn't put my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ibj6tar4                          Tardif - direct

1   hands on his.

2   Q.  Who, if anyone, were you touching when Sergeant Mattera

3   grabbed you?

4   A.  No one.

5   Q.  And after Sergeant Mattera threw you to the ground and you

6   were prone on the ground, what happened next?

7   A.  I remember feeling a lot of pain and then I don't remember

8   anything.  I lost consciousness.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBJ6TAR6                        Tardif - cross

1   ████████████████████████████████████████████████

2   ██████████████████████

3   ███████████████████████████████████████████████████

4   ██████████████████████████████

5   █████████████████████

6   ████████████████████████████████████████████?

7   ████████████

8   Q.  You say an officer who was wearing a white shirt threw you;

9   right?

10  A.  I said an officer threw me.

11  Q.  I am sorry?

12  A.  I said an officer threw me.

13           MS. GOYKADOSH:  I would like to refer the Court,

14  plaintiff's counsel and plaintiff to Exhibit H.  Page 30, lines

15  18 to 21.

16  A.  Page 30?

17  Q.  Page 30, lines 18 to 21.

18           MS. GOYKADOSH:  If your Honor would like I can start

19  earlier from line six so that we have the complete question and

20  answer.

21           May I proceed?

22           THE COURT:  You may.

23  BY MS. GOYKADOSH:

24  Q.  Ms. Tardif, were you asked this question and did you give

25  this answer:

IBJ6TAR6                        Tardif - cross

1   "Q.  Sorry.  Tell me what happened.

2   "A.  They had said that any lose property would be taken and

3   thrown away.  So we had all gone to each of our individual

4   properties and stood with our property between our legs and

5   said that we were attending this property.  Then they started

6   to push people.  I got an officer with a baton -- I got an

7   officer with a baton that pushed me and my partner for the

8   night, Jose, had picked me back up.  And then another girl next

9   to me had fallen over and then when I turned, I had gotten

10  picked up by, like, the back of my neck and my waist-ish area.

11  I had gotten picked up by an officer in a white shirt."

12          Ms. Tardif were you asked that question and did you

13  give that answer?

14  A.  Yes.

15  Q.  So it was officer in a white shirt who picked you up in

16  your waist-ish area; correct?

17  A.  Back then that's the best of my recollection.  I remember

18  the face a lot, not the shirt.

19  Q.  So when you gave your 50 H testimony in December of 2012

20  under oath about six months after this incident, you remembered

21  an officer wearing a white shirt; right?

22  A.  Yes.  But I remember the face than anything else.

23  Q.  But you testified about the white shirt?

24  A.  Yes.

25  Q.  You say that you were thrown causing you to feel

IBJ6TAR6                          Tardif - cross

1   weightless; right?

2   A.  Yes.

3           MS. GOYKADOSH:  Let's watch what has already been

4   introduced into evidence as Plaintiff's Exhibit 22.

5           One moment, your Honor.

6           We're going to watch seconds 39 to 56.  It's already

7   been introduced into evidence.

8           I am just finishing up so I am very close to the end.

9   I know it is almost 4:00.

10          I am sorry, your Honor, I will move on while my

11  co-counsel is doing this.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBJ6TAR6                    Tardif - cross

1  ▆▆▆▆▆▆▆▆▆▆

2  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

3  ▆▆▆▆▆▆▆▆▆▆▆

4  ▆▆▆▆▆▆▆▆▆▆▆▆▆

5  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

6  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

7  ▆▆▆▆▆▆▆▆.

8  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

9  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

10  ▆▆▆▆

11          MS. GOYKADOSH:  We're going to play the exhibit now.

12  Sorry we had some problems with it before.  Exhibit 19 from 48

13  to 58 seconds.  I think only up to 56 seconds was admitted into

14  evidence, but if I can play it up to 58 if counsel doesn't

15  object.

16          MR. KRIEGER:  No problem.

17          MS. GOYKADOSH:  Thank you.

18          (Video played)

19  BY MS. GOYKADOSH:

20  Q.  You are not actually getting thrown here; right?

21  A.  I am.

22  Q.  We can play it again.  But your torso is up right when the

23  video clip first began; right?

24  A.  I don't know where I was.  I don't see myself on the

25  screen.

IBJ6TAR6                         Tardif - cross

1    Q.  Why don't we start again.  The way I see it I look out for

2    the red medic cross.  Why don't you look out for that as well.

3            (Video played)

4            MS. GOYKADOSH:  We stopped the video at 55 seconds.

5    Q.  Is it fair to say that your torso is up right at this

6    point?

7    A.  Yes.

8    Q.  And we'll play it for the next three seconds, please.

9            (Video played)

10   Q.  Is it fair to say you are descending downwards at this

11   point?

12   A.  Yes.

13

14

15

16

17

18

19

20

21

22

23

24

25

Court
Exhibit #8
11/21/18
2:13p.m.

The jury requests to view the 1st two videos regarding Sgt Mattera, again.

Also, we'd like to see Sgt Mattera's testimony and Plaintiff's testimony re. 3/21/12

Ct. Ex. 1
11-21-18
11:25 a.m.

To the jury

in Ex. 19 the jury asked if it could
be played without the slow motion effect.
It can. Would you like to have it
played for you without the slow motion
effect.

The parties want to note that they
are not responsible for the slow
motion effect and the sound that
accompanied. This was how the video
was received by the parties.

Judge Wood

We do not need to see it again.
Thanks for asking.

Jury

Ct. Ex. 6
11-21-18

We request to view
all videos referring
to evidence regarding
Lt. Mattera.

Request to view
video at standard
speed and in slo. mo.

10:20
a.m.

Is there anything unique about a Police Ofcr.
carrying out a law enforcement function
(but not a lawful arrest) that should be
considered when assessing an assault
and battery claim.
?

To clarify a point of law.

Court Exhibit #5
11/20/19 4:28pm.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARY M. TARDIF,

                Plaintiff,

     v.

CITY OF NEW YORK, POLICE OFFICER
MARSHA RUMBLE, POLICE OFFICER
FELIX SCHMIDT, SERGEANT THOMAS
MCMANUS,

                Defendants.

13-CV-4056 (KMW)

---

## **JURY INSTRUCTIONS**

<u>Table of Contents</u>

GENERAL INSTRUCTIONS ................................................................. 4

   1.   Roles of the Court and Jury ................................................ 4

   2.   What Evidence Is and Is Not .............................................. 5

   3.   Sympathy or Bias .......................................................... 6

   4.   All Persons Equal Before the Law ...................................... 7

   5.   Burden of Proof ............................................................ 7

   6.   Note-Taking by Jurors .................................................... 8

   7.   Number of Witnesses and Uncontradicted Testimony ............... 8

   8.   Witness Credibility ........................................................ 9

   9.   Interested Witnesses ...................................................... 10

   10.  Testimony Given Under Oath ........................................... 10

   11.  The NYPD Patrol Guide ................................................. 10

INSTRUCTIONS CONCERNING SPECIFIC CLAIMS ........................... 12

   12.  Overview of Claims ....................................................... 12

   13.  42 U.S.C. § 1983 ......................................................... 13

   14.  First Element: Acting under Color of State Law ..................... 13

   15.  Second Element: Deprivation of a Constitutional Right ............ 13

   a. Commission of Alleged Acts .............................................. 14

b. Loss of a Constitutional Right ................................................................. 14

(i) Excessive Force.................................................................................... 14

(ii) Unconstitutional Conditions of Confinement .......................................... 16

(iii) Deliberate Indifference to a Serious Medical Need............................... 18

16.    Third Element: Proximate Cause ......................................................... 20

17.    State Law Claims ................................................................................ 21

18.    Assault.............................................................................................. 21

19.    Battery .............................................................................................. 22

20.    Damages – Cautionary Instructions ..................................................... 23

21.    Damages – Compensatory Damages or Nominal Damages; Multiple Defendants
        23

22.    Damages – Punitive Damages.............................................................. 25

23.    Right to See Exhibits and Transcripts of Testimony During Deliberations;
Communications With the Court ..................................................................... 27

CONCLUSION................................................................................. 28

## GENERAL INSTRUCTIONS

### 1.  Roles of the Court and Jury

Members of the jury, we now approach the critical time in this case—the time when the case will be handed over to you for your judgment and verdict on the facts.

It is my responsibility now to instruct you on the law.

I begin by explaining to you your role and my role.  The jury's role is to decide the questions of fact and, on that basis, to render its verdict.

You are the sole judges of the facts.  That is a very great responsibility that you are to exercise with an attitude of complete fairness and impartiality.  Your decision is to be based solely on the evidence or the lack of evidence.  It may not be influenced by bias, prejudice, or sympathy.

My job includes two basic functions.  First, I make rulings on disputed issues of law. What rulings I have made should not concern you.  My second function is to instruct you on the law—that is, to explain to you the rules of law that govern your deliberations and to provide you with the questions you must answer in reaching your verdicts.  It is your duty to accept the law as I state it to you in these instructions, and to then apply it to the facts as you decide them.  If an attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You must not substitute any concept of what the law should be for what I tell you that the law is.  Just as you alone find the facts, I alone determine the law, and you are duty-bound to accept the law as I state it.

It is important for you to listen carefully to the instructions and apply the law to the evidence or lack of evidence in this case as I explain the law to you.

4

## 2.   What Evidence Is and Is Not

In determining the facts, you must rely upon your own recollection of the evidence. What is evidence?  Evidence consists primarily of the testimony of witnesses and the exhibits that have been received.  It also includes facts that have been stipulated.

What the lawyers have said in their opening statements, in their summations, in their objections, or in their questions is not evidence.  You should bear in mind that a question put to a witness is never evidence.  It is only the witness's answer that is evidence.  However, you may not consider any answers that I have ordered stricken from the record.

The lawyers' arguments are intended to persuade you to draw certain conclusions from the evidence or lack of evidence.  Those arguments are important.  You should weigh and evaluate them carefully.  But you must not confuse them with the evidence.  As to what the evidence was, it is your recollection that governs, not the statements of the lawyers.

You should draw no inference or conclusion for or against any party by reason of lawyers making objections or my rulings on such objections.  Counsel have not only the right, but the duty, to make legal objections when they think that such objections are appropriate.  You should not be swayed against the Plaintiff or the Defendants simply because the lawyers for either side have chosen to make an objection.  Similarly, statements made by the lawyers when arguing about the admissibility of evidence are not to be considered as evidence.

Nothing I say is evidence.  It is your recollection that governs.

Do not draw any inference from any of my rulings.  The rulings I have made during trial are not any indication of my view of what verdict you should render.  My rulings were based solely on issues of law.

Do not concern yourself with what was said at side bar conferences or during my discussions with counsel.  Those discussions related to rulings of law and not to matters of fact.

At times I may have admonished a witness or directed a witness to be responsive to questions, to keep his or her voice up, or to speak more clearly or slowly. My instructions were intended only to facilitate the presentation of evidence. You should draw no inference or conclusion, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine. Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you. That is entirely your role.

### 3.  Sympathy or Bias

You are required to evaluate the evidence objectively, and you must be completely fair and impartial. Your verdict must be based solely on the evidence introduced at this trial, or the lack of evidence. The parties in this case are entitled to a trial free from prejudice or bias for or against either side. Our judicial system only works if you reach your verdict through a fair and impartial consideration of the evidence.

In deciding the facts of the case, it would be improper for you to consider any personal feelings you may have about any party or any witness, or any other such irrelevant factor. This case must be decided by you as a lawsuit between parties of equal standing in the community and of equal worth. All parties are entitled to the same fair trial. All parties stand equal before the law and are to be dealt with as equals in this Court.

### 4. All Persons Equal Before the Law

In reaching your verdict, you must remember that all parties stand equal before a jury in the courts of the United States. You have heard the testimony of police officers. The fact that a party or a witness may be employed as a police officer does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary party or witness. It is your decision, after reviewing all the evidence, whether to accept or reject all or parts of the testimony of the law enforcement witnesses as you would any other witness and to give that testimony whatever weight, if any, you find it deserves.

### 5. Burden of Proof

The Plaintiff has the burden of proving all the elements of her claims by a preponderance of the evidence.

What does a "preponderance of the evidence" mean? To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not. A preponderance of the evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not the number of witnesses or documents. In determining whether a claim has been proven by a preponderance of the evidence, you should consider the testimony of all witnesses, regardless of who called them.

If, after considering all of the evidence, you are satisfied that the Plaintiff has carried her burden on each essential element of her claim, then you must find in the Plaintiff's favor. If, after such consideration, you find that the evidence in favor of the Plaintiff is outweighed by the evidence against the Plaintiff's position, or that the credible evidence on a given issue is equally divided between the parties—that it is equally as probable that one side is right as it is that the other side is right—then you must decide that issue against the Plaintiff. Because the Plaintiff

7

has the burden of proof, she must do more than simply produce evidence that is equal to the evidence of the other side.  In order to satisfy her burden, she must prove each element of her claim by a preponderance of the evidence.  However, Plaintiff need prove no more than a preponderance.  So, if you find that the scales tip, however slightly, in favor of the Plaintiff—that what she claims is more likely true than not, even by just a little—then that element will have been proven by a preponderance of the evidence.

### 6.  Note-Taking by Jurors

Some of you have taken notes during parts of the trial.  Notes can be useful to focus a note-taker's attention, and may aid the recollection of the note-taker.  Note-taking may, however, distract a note-taker from hearing or seeing other important evidence.  Thus, the best way to assist your recall is to ask to have a transcript of the testimony sent to you, and not to rely on notes.  Please remember that just because one juror may have notes does not mean the notes are any more accurate than any other juror's recollection.  And—in case anyone took notes during the lawyers' arguments—please keep in mind that the lawyers' arguments are not evidence.  As I have already mentioned, any of the testimony from the trial is available to you, and all of the exhibits.

### 7.  Number of Witnesses and Uncontradicted Testimony

The fact that one party called more witnesses does not mean that you should necessarily find the facts in favor of the side offering the most witnesses.  By the same token, you do not have to accept the testimony of any witness who has not been contradicted or impeached, if you find the witness not to be credible.  You must decide which witnesses to believe and determine which facts are true.  To do this, you must look at all the evidence or lack of evidence, drawing

upon your own common sense and personal experience.  After examining all the evidence, you may decide that the party calling the most witnesses has not persuaded you because you do not believe its witnesses, or because you do believe the fewer witnesses called by the other side.

## 8.   Witness Credibility

You have had the opportunity to observe the witnesses.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.  Decide what testimony to believe and what not to believe.  Consider: each witness's demeanor and manner of testifying; their opportunity to see, hear and know about the events described; the witness's ability to recall and describe those things; and the reasonableness of the testimony in light of all the other evidence in the case.  Consider whether part of a witness's testimony was contradicted or supported by other testimony, by what the witness said or did on a prior occasion, or by the testimony of other witnesses or other evidence.  Consider whether a witness had an opportunity to observe the facts he or she testified about, and whether the witness's recollection of the facts stands up in light of other evidence in the case.

If you find that a witness has willfully testified falsely as to an important matter, you may disregard the witness's entire testimony, or you may accept as much of the testimony as you find to be true and disregard what you find to be false.  A witness may have been mistaken or may have lied in part of his or her testimony while having been accurate and truthful in other parts.

Going back to witnesses generally, what you must try to do in deciding credibility is to size up a person just as you would in any important matter in your own life where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

### 9.  Interested Witnesses

In deciding whether to believe a witness, you should take into account any evidence that shows that the witness may benefit in some way from the outcome of the case, such as a legal, financial or personal interest.  Any such witness is called an "interested witness."

Likewise, you should specifically note any evidence of hostility or friendship that the witness may have towards or against either of the parties.  You should also consider any other interest or motive that the witness may have in helping a particular party.  If you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

### 10. Testimony Given Under Oath

Some of the testimony before you is in the form of depositions which have been received in evidence.  A deposition is simply a procedure where the attorneys for one side may question a witness or an adverse party under oath before a court stenographer prior to trial.  This is part of the pretrial discovery, and each side is entitled to take depositions.  You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at trial.

### 11. The NYPD Patrol Guide

You may consider the NYPD Patrol Guide as evidence of what it means for a police officer to act reasonably.  You should understand the Patrol Guide and the U.S. Constitution are not coextensive.  A particular action could violate the Patrol Guide without violating the Constitution.  Similarly, an officer could violate the Constitution and/or state law without violating the Patrol Guide.  In this case, it is the federal constitution and state law that control.

Therefore, you must determine whether the plaintiff's constitutional rights were violated, or whether any officer violated state law, not whether all parties complied with the rules and regulations of the NYPD.

## INSTRUCTIONS CONCERNING SPECIFIC CLAIMS

### 12. Overview of Claims

In this case, the Plaintiff, Mary Tardif, brings several claims.  I will explain what each of these claims mean in a moment, but first I will give you an overview of the claims.  Plaintiff brings three of her claims under a civil rights statute, Title 42, United States Code, Section 1983.  First, she brings a claim for deliberate indifference to a serious medical need against Defendants Rumble and Schmidt.  Second, she brings a claim of unconstitutional conditions of confinement, also against Defendants Rumble and Schmidt.  Third, she brings a claim of excessive force against Defendant McManus.

In addition to those claims, Plaintiff brings assault and battery claims under New York state law.  The first set of assault and battery claims are against Sergeant McManus.  These claims are based on the same underlying conduct as Plaintiff's claim against Sergeant McManus for excessive force.  Plaintiff also brings a *respondeat superior* against the City of New York based on Sergeant McManus's conduct, which means she claims the City should be held responsible for Sergeant McManus's alleged assault and battery.

Plaintiff's other assault and battery claims are based on alleged conduct by four different officers—an unidentified officer, Sergeant Mattera, Lieutenant Destefano, and Officer Aminova.  These individuals are not seated in the courtroom with the Defendants because Plaintiff did not bring claims against them individually, like she did with Sergeant McManus.  Instead, she brings *respondeat superior* claims against the City based on their alleged conduct, meaning that she seeks to hold the City responsible for their alleged conduct.

You must consider the possible liability of each Defendant separately.

### 13. 42 U.S.C. § 1983

Plaintiff asserts her deliberate indifference to a serious medical need, unconstitutional conditions of confinement, and excessive force claims pursuant to Section 1983.  In order to prevail on the claims brought pursuant to Section 1983, Plaintiff must prove by a preponderance of the evidence that:

1. The Defendant you are considering was acting under color of law at the time of the incidents on March 21, 2012, April 16, 2012 occurred.  This is not contested.

2. The conduct of the Defendant you are considering deprived Plaintiff of a right protected by the Constitution of the United States; and

3. The conduct of the Defendant you are considering was a proximate cause of the injuries and damages sustained by Plaintiff, if any.

I will explain these elements to you.

### 14. First Element: Acting under Color of State Law

As to the first element, acting under color of state law, this means acting in one's capacity as a police officer.  In this case, there is no dispute that, at the time of the alleged violations, Officer Rumble, Officer Schmidt, Sergeant McManus were employees of the New York City Police Department, and were acting under color of state law.  Therefore, I instruct you that the first element of Plaintiff's § 1983 claims has been met.

### 15. Second Element: Deprivation of a Constitutional Right

As to the second element, Plaintiff must show that she was intentionally or recklessly deprived of a constitutional right by the Defendant you are considering.  Specifically, Plaintiff must show, by a preponderance of the evidence, that (a) the Defendant you are considering

committed the acts alleged by Plaintiff; (b) the alleged acts caused Plaintiff to suffer the loss of a constitutional right; and (c) in performing the alleged acts, the Defendant acted intentionally or recklessly.

### a. Commission of Alleged Acts

The first thing for you to determine is whether the Defendant you are considering committed one of the acts Plaintiff alleges, meaning either excessive force, deliberate indifference to a serious medical need, or unconstitutional conditions of confinement.  If you find that Plaintiff has failed to prove by a preponderance of the credible evidence that the Defendant you are considering committed the acts or omissions alleged by Plaintiff, you must find in favor of that Defendant.

### b. Loss of a Constitutional Right

If you determine that the Defendant you are considering committed the acts alleged by Plaintiff, you must next determine whether those acts caused Plaintiff to suffer the loss of a constitutional right.

### (i) Excessive Force

Plaintiff alleges that Defendant Sergeant McManus violated her Fourteenth Amendment rights by using excessive force upon her.  Sergeant McManus disputes Plaintiff's version of events.

To establish that Sergeant McManus engaged in the excessive use of force against her, Plaintiff must prove by a preponderance of the evidence each of the following:

1. That Sergeant McManus used force against Plaintiff on March 21, 2012;

2. That at the time, Sergeant McManus used some amount of force intentionally or recklessly; and

14

3. That Sergeant McManus used a level of force that was objectively unreasonable.

To qualify as excessive, Sergeant McManus's use of some force must have been intentional or reckless. An act is intentional if it is done knowingly, that is, if it is done voluntarily and deliberately, and not because of mistake, accident, negligence, or another innocent reason. An act is reckless if it is done with conscious disregard for its known probable consequences. To be clear, Plaintiff is required to prove only that Sergeant McManus used some amount of force intentionally or recklessly. She is not required to show that Sergeant McManus intended to violate her constitutional rights or intended to use excessive force. In determining whether a person acted intentionally or recklessly, you should remember that there is no way of looking into a person's mind. You must decide what was done, and whether you believe what the people involved said was in their minds.

To show that the level of force was excessive, Plaintiff must show that any force used was objectively unreasonable in light of the facts and circumstances confronting Sergeant McManus at the time, without regard to his underlying intention or motivation. In other words, you must determine whether any amount of force was that which a reasonable law enforcement officer would have employed under similar circumstances. In this regard, you are not to decide if the least amount of force was used, but rather you are only to decide if the force that was used, if any, was reasonable. You may consider the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline, or maliciously for the very purpose of causing harm. Although you may consider these factors, Plaintiff need not prove that Sergeant McManus acted with malice in order to prevail.

15

You should not make this determination, however, by considering how the facts appear when assessed with 20/20 hindsight. You may make allowance for the fact that officers are often forced to make split-second judgments about the amount of force that is necessary in circumstances that are tense, uncertain, and rapidly evolving. Not every use of force by a police officer constitutes excessive force, even if it may later seem unnecessary in the peace and quiet of this courtroom.

Keep in mind that accidental or negligent acts do not give rise to Fourteenth Amendment liability. If you find that Sergeant McManus's actions were an accident, you must find in favor of him on Plaintiff's excessive force claim.

### (ii) Unconstitutional Conditions of Confinement

Plaintiff alleges that Defendant Officers Schmidt and Rumble violated her Fourteenth Amendment rights by being deliberately indifferent to her conditions of confinement in the police van. The Defendants dispute Plaintiff's version of events, and Defendant officers Rumble and Schmidt claim that their actions were justified, reasonable under the circumstances, and in accordance with the law.

To establish that the Defendant subjected Plaintiff to unconstitutional conditions of confinement, Plaintiff must prove by a preponderance of the evidence each of the following:

1. The conditions in the police van were sufficiently serious;

2. The Defendant acted intentionally to impose the alleged conditions, or recklessly failed to act with reasonable care to mitigate the risk that the conditions posed to her; and

3. The Defendant was deliberately indifferent to the serious conditions.

For Plaintiff to prove her claim of unconstitutional conditions of confinement, she must show that the conditions in the police van were sufficiently serious. Sufficiently serious means

that the conditions posed an unreasonable risk of serious damage to Plaintiff's health.  This includes the risk of serious damage to physical and mental soundness.  You should evaluate the conditions in light of contemporary standards of decency, considering the severity and duration of the conditions.  You may consider whether Plaintiff was injured as a result of the conditions, but there is no requirement that Plaintiff show that she suffered a serious injury in order for you to find that the conditions were sufficiently serious.

If you find that the conditions were sufficiently serious, Plaintiff must also show that the Defendant officer was deliberately indifferent to the serious conditions.  That means that the defendant acted intentionally to impose the alleged conditions, or recklessly failed to act with reasonable care to mitigate the risk that the conditions posed to Plaintiff, even though the defendant knew, or should have known, that the conditions posed an excessive risk to Plaintiff's health or safety.  As I explained previously with respect to Plaintiff's excessive force claim, an act is intentional if it is done knowingly, that is, if it is done voluntarily and deliberately, and not because of mistake, accident, negligence, or another innocent reason.  A failure to act is reckless if it is done with conscious disregard for its known probable consequences.  In determining whether a person intentionally acted or recklessly failed to act, you should remember that there is no way of looking into a person's mind.  You must decide what was done, and whether you believe what the people involved said was in their minds.

Finally, I instruct you that a failure to seatbelt is not a constitutional violation.   This is because a failure to seatbelt—by itself—does not expose a person who is arrested to a risk of constitutional dimension.   Therefore, even if you find that plaintiff was not seat-belted, that alone is not enough to find for the Plaintiff.

### (iii) Deliberate Indifference to a Serious Medical Need

Plaintiff also alleges that Defendant Officers Schmidt and Rumble violated her Fourteenth Amendment rights by being deliberately indifferent to her serious medical need. The Defendants dispute Plaintiff's version of events, and Rumble and the City claim that their actions were justified, reasonable under the circumstances, and in accordance with the law.

To establish that a Defendant was deliberately indifferent to her serious medical need, Plaintiff must prove by a preponderance of the evidence each of the following:

1. Plaintiff's medical need was sufficiently serious; and

2. The Defendant was deliberately indifferent to the serious medical need, that is, he or she knew of and disregarded an excessive risk to Plaintiff's health and safety.

In considering whether the Defendant was deliberately indifferent to Plaintiff's serious medical need, you first must consider whether Plaintiff had a serious medical need or something less. A medical need is serious if it presents a condition of urgency, one that may produce death, degeneration, or extreme pain. In this case, Plaintiff claims that the Defendant delayed providing her treatment for her serious medical need. It is therefore appropriate for you to focus on the seriousness of the particular risk of harm that resulted from the challenged delay in treatment rather than the Plaintiff's underlying medical condition alone. Not every lapse in medical care is a constitutional wrong.

If Plaintiff had a serious medical need, she next must establish that the Defendant was deliberately indifferent to that serious medical need. That means that the defendant acted intentionally to impose the delay in care, or recklessly failed to act with reasonable care to mitigate the risk that the medical need posed to Plaintiff, even though the defendant knew, or should have known, that the condition posed an excessive risk to Plaintiff's health or safety. As I explained

previously, an act is intentional if it is done knowingly, that is, if it is done voluntarily and deliberately, and not because of mistake, accident, negligence, or another innocent reason. A failure to act is reckless if it is done with conscious disregard for its known probable consequences. In determining whether a person intentionally acted or recklessly failed to act, you should remember that there is no way of looking into a person's mind. You must decide what was done, and whether you believe what the people involved said was in their minds.

If you find that Defendants Rumble and Schmidt were negligent in obtaining and/or rendering medical care for Plaintiff, that is insufficient for a deliberate indifference claim, and you should find in their favor.

### 16. Third Element: Proximate Cause

The third element that Plaintiff must prove is that the acts of the Defendant you are considering were a proximate cause of the injuries Plaintiff sustained, if any.  Proximate cause means that there must be a sufficient causal connection between the act or omission of a Defendant and any injury or damage sustained by Plaintiff.  If you find that a Defendant's acts or omissions were a substantial factor in bringing about or actually causing any injury to Plaintiff, then that Defendant's acts or omissions were a proximate cause of that injury, if any.

In order to recover damages for any injury, Plaintiff must show by a preponderance of the evidence that her injury would not have occurred without the acts or omissions of the Defendant you are considering.  If you find that the Defendant you are considering has proven, by a preponderance of the evidence, that Plaintiff complains about an injury that would have occurred even in the absence of Defendant's acts or omissions, you must find that the Defendant you are considering did not proximately cause Plaintiff's injury.

### 17. State Law Claims

In addition to Plaintiff's Section 1983 claim under federal law, she brings state law claims against Sergeant McManus and against the City of New York for assault and battery. The claims against the City are based on the alleged assaults and batteries by Sergeant McManus, Sergeant Mattera, Lieutenant Destefano, Officer Aminova, and the unidentified officer.

### 18. Assault

An assault is the intentional placing of another person in fear of imminent harmful or offensive contact. To recover for assault, Plaintiff must prove by a preponderance of the evidence that the officer accused of assault intentionally took actions that put her in fear that a harmful or offensive bodily contact was about to occur. The officer must have had the real or apparent ability to bring about that harmful or offensive bodily contact. Ordinarily, threatening words without some action are not enough to constitute an assault; there must be some menacing act or gesture that causes plaintiff to believe that a harmful or offensive bodily contact is about to occur. However, it is not necessary that any contact actually occurred.

I used the word "intentionally" in defining an assault. Intent involves the state of mind with which an act is done. As I explained previously, an act is intentional if it is done knowingly, that is, if it is done voluntarily and deliberately, and not because of mistake, accident, negligence, or another innocent reason.

If the alleged assault occurred during a lawful arrest, Plaintiff must also prove that the officers' conduct was unreasonable. This is because under New York law, a police officer may use physical force in the course of an arrest to the extent he or she reasonably believes such force to be necessary to effect the arrest. I instruct you that when Plaintiff was arrested on April 16, 2012, her arrest was lawful. Accordingly, with respect to Plaintiff's claims for assault by

Lieutenant Destefano and Officer Aminova, Plaintiff must show not only that the officers put her in fear of harmful or offensive bodily contact and that they intended to do so, but also that they acted unreasonably under the circumstances.  In determining whether the officers acted reasonably, you may consider the need for the application of force, the relationship between the need and the amount of force that was used, the extent of an injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline, or maliciously for the very purpose of causing harm.

### 19. Battery

A person who intentionally touches another person without that person's consent and thereby causes an offensive bodily contact, commits battery.  As I have explained, intent involves the state of mind with which an act is done.  To recover on her battery claim, Plaintiff must prove that the officer accused of battery had the intent to cause a bodily contact that a reasonable person would find offensive.  An offensive bodily contact is one that harms another, or one that offends a reasonable sense of personal dignity, or one that is otherwise wrongful.

If the alleged battery occurred during a lawful arrest, Plaintiff must <u>also</u> prove that the officers' use of force was unreasonable in light of the circumstances.  This is because under New York law, a police officer may use physical force in the course of an arrest to the extent he or she reasonably believes such force to be necessary to effect the arrest.

I instruct you that Plaintiff's arrest on April 16, 2012, was lawful.  Accordingly, to find in favor of Plaintiff on her claims for battery by Lieutenant Destefano and Officer Aminova, you must find not only that the officer in question intentionally caused harmful or offensive bodily contact, <u>but also</u> that the force he or she used was unreasonable in light of the circumstances.  In determining whether the officer acted unreasonably, you may consider the need for the

22

application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline, or maliciously for the purpose of causing harm.

## 20. Damages – Cautionary Instructions

I have a few cautionary instructions to give you before I discuss damages.  First, even though I am going to instruct you on damages, that does not mean I have any opinion on whether or not the Defendants should be held liable.  Second, with respect to Plaintiff's claims, you may award her damages only if she has proven liability according to the standards I have just articulated.  Damages must be based on evidence, not on speculation or sympathy, and you may award damages for only those injuries that Plaintiff actually suffered as a result of a Defendant's conduct.  If you do find that damages should be awarded, the award is not subject to federal or state income taxes, and you should not consider such taxes in determining your award.  Similarly, you should not take into consideration attorneys' fees or court costs, which will be decided by the Court.  The damages that you award must be fair compensation, no more and no less.  It is the Plaintiff who bears the burden of proving her damages by a preponderance of the credible evidence.

## 21. Damages – Compensatory Damages or Nominal Damages; Multiple Defendants

If you find in favor of Plaintiff on any of her claims, then you must determine an amount that is fair compensation for her injuries.  This type of damages is known as "compensatory damages."  You may award compensatory damages only for injuries that Plaintiff proved were caused by an officer's wrongful conduct.  The damages that you award must be fair compensation—no more and no less—for the loss, if any, which resulted from an officer's

wrongful conduct.  The purpose of these damages is to make Plaintiff whole—to put Plaintiff in the same position that she would have been in had there been no violation of her rights.  The purpose is not to punish a Defendant.

Compensatory damages may include medical expenses from hospitals or other medical facilities or providers, as well as lost earnings.  Compensatory damages are not limited merely to expenses that Plaintiff may have borne, however. If you find in favor of Plaintiff on a claim, she is entitled to compensatory damages for any physical injury, pain and suffering, mental anguish, shock and discomfort caused by an officer's wrongful conduct.  Please keep in mind, though, that in order to recover damages, Plaintiff must present credible evidence that an officer's impermissible conduct *caused* the injury she complains of.  Plaintiff does not need to provide evidence from a medical expert in order to satisfy this requirement.

There is no exact standard for determining the precise amount of damages.  An award you make must be fair and reasonable in light of the evidence at trial.  It must not be based only on speculation or sympathy.

Although there are multiple Defendants in this case, it does not follow that if you find one to be liable, they are all liable.  Each officer is entitled to fair, separate and individual consideration of the case against him or her on each claim, without regard to your decision as to the other officers and the other claims.

Furthermore, you should not award compensatory damages more than once for the same injury. For example, if Plaintiff were to prevail on two claims and establish an injury in a certain dollar amount, you could not award her that amount on *each* of the two claims—she is only entitled to be made whole again, not to recover more than she lost.  If you decide that two or more of the officers are liable on a particular claim, then you must simply determine the overall

amount of damages for which they are liable on that claim, without breaking that figure down into individual percentages.

If you find in favor of Plaintiff on any of her claims, but do not award compensatory damages, then you must award "nominal damages," which are damages that do not exceed one dollar. Nominal damages are awarded as recognition that a Plaintiff's rights have been violated. If you find after considering all the evidence presented that, with respect to any claim, the Plaintiff's rights were violated, but that the Plaintiff has failed to prove by a preponderance of the evidence that she suffered any actual damages as a result of the violation, you must award the Plaintiff nominal damages.

You may also award nominal damages if, upon finding that some injury resulted from the deprivation of the Plaintiff's rights, you find that you are unable to compute monetary damages except by engaging in pure speculation and guessing.

You may not award both nominal and compensatory damages to the Plaintiff for the same claim. Either Plaintiff *experienced actual damages*, in which case you must award damages, or she did *not experience actual damages* in which case you must award nominal damages. Nominal damages may be awarded only for a token sum, not to exceed one dollar.

## 22. Damages – Punitive Damages

In addition to compensatory or nominal damages, if you find in Plaintiff's favor in connection with her claims, you may choose to make a separate and additional award of punitive damages.

Punitive damages are awarded, in the discretion of the jury, to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him or her from committing such conduct in the future.

You may award punitive damages if you find that the acts of an officer were done maliciously or wantonly. An act is maliciously done if it is prompted by ill will or spite towards the injured person. An act is wanton if it is done with a reckless or callous disregard for the rights of the injured person. Plaintiff has the burden of proving, by a preponderance of the evidence, that the officer you are considering acted maliciously or wantonly with regard to Plaintiff's rights.

If you find by a preponderance of the evidence that an officer acted with malicious intent to violate Plaintiff's rights, or with a callous or reckless disregard of Plaintiff's rights, then you may award punitive damages. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him or her and others like him or her from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether the Defendant may be adequately punished by an award of actual damages only, or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent the Defendant from similar wrongful conduct in the future, if it was in fact wrongful, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the individual Defendants may have committed.

If you decide to award punitive damages, these same purposes should be kept in mind as

you determine the appropriate sum of money to be awarded as punitive damages.  That is, in

fixing the sum to be awarded, you should consider the degree to which the Defendants should be

punished for the wrongful conduct, and the degree to which an award of one sum or another will

deter the defendants or persons like them from committing wrongful acts in the future.

I instruct you that punitive damages are not available to Plaintiff for any claim associated

with the unidentified police officer, Lieutenant Mattera, Lieutenant Destefano, and/or Officer

Aminova.

### 23. Right to See Exhibits and Transcripts of Testimony During Deliberations; Communications With the Court

You are about to go into the jury room and begin your deliberations. The exhibits will be

sent into the jury room.  If, during your deliberations, you want to see transcripts of testimony,

they will be furnished to you.  But please remember that it is not always easy to locate the item

you might want, so be as specific as you possibly can be in framing any request.

Your requests for testimony—in fact, any communication with the Court—should be

made to me in writing, signed by your foreperson, and given to one of the marshals.  I will

respond to any questions or requests you have as promptly as possible, either in writing or by

having you return to the courtroom so I can speak with you in person.  In any event, do not tell

me or anyone else how the jury stands on the issue of the Defendants' liability, or lack of

liability, until after a unanimous verdict is reached.

## CONCLUSION

Your function now is to weigh the evidence in this case and render your verdict. You must base your verdict solely on the evidence, or lack of evidence, and these instructions as to the law, and you are obliged under your oath as jurors to follow the law as I have instructed you, whether you agree or disagree with the particular law in question. The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can possibly do so without violence to individual judgment. Each of you must decide the case for himself or herself, but do so only after an impartial discussion and consideration of all the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change an opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors. Remember at all times, you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case. Do not engage in deliberations unless all seven of you are present.

If you are divided, do not report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court.

In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense you will reach a fair verdict here. Remember that your verdict must be rendered without fear, without favor, and without prejudice or sympathy.

You are free to select any foreperson you like.  The foreperson will preside over your deliberations, and will be your spokesperson here in court.  That is simply for convenience, and it gives him or her no greater authority, and his or her vote has no greater weight than that of any other juror.

I will give each of you a verdict form for your convenience; the foreperson will have a verdict form on which he or she should record any verdict you reach unanimously.

Members of the jury, I am going to ask you to remain seated briefly while I confer with counsel to see if there are any additional instructions that they would like to have me give to you.  Because there is a possibility that I might find it proper to give you such additional instructions, I ask that you not discuss the case while seated in the jury box.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY M. TARDIF,

                                        Plaintiff,

                    v.                                          13-CV-4056 (KMW)

CITY OF NEW YORK, POLICE OFFICER
MARSHA RUMBLE, POLICE OFFICER FELIX
SCHMIDT, AND SERGEANT THOMAS
MCMANUS,

                                        Defendants.

Court Exhibit #3

Δ's Peremptory

11/14/18  1:25p.m

1

7

8

Court Exhibit #2

Plaintiff's Peremptory

11/14/18   1:25 p.m.

2,4,10

COURT EXHIBIT #1

11/14/18   9:35 a.m.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY M. TARDIF,

                                    Plaintiff,

                    v.                                            13-CV-4056 (KMW)

                                                          **JUROR QUESTIONNAIRE**

CITY OF NEW YORK, POLICE OFFICER
MARSHA RUMBLE, POLICE OFFICER FELIX
SCHMIDT, AND SERGEANT THOMAS
MCMANUS,

                                    Defendants.


**PLEASE DO NOT READ FURTHER OR WRITE ANYTHING ON THIS QUESTIONNAIRE
UNTIL THE JUDGE TELLS YOU TO DO SO**

### GENERAL JUROR QUESTIONNAIRE – Part I

**When asked, please indicate if your answer to the question is "yes" by raising your hand.  If your answer to the question is "no," you should not do anything.**

1. Do you have a problem with your hearing or vision that would prevent you from giving full attention to all of the evidence at this trial?

2. Do you have any medical problems that might interfere with your service as a juror in this case?

3. Do you have any difficulty understanding or reading English?

4. As I noted, this trial is expected to last no longer than one week.  Do you have any commitments, medical problems, or personal problems that would interfere with your serving as a juror in a trial that is expected to end by Wednesday, November 21, 2018?

5. Do you have any religious or ethical beliefs that would prevent you from passing judgment on another person?

6. Do you have any personal knowledge of the allegations in this case as I have described them?

7. Have you read or heard anything about this case through the media, the internet, or through any other source that would prevent you from rendering a fair and impartial judgment in this case?

8. As I mentioned earlier, the Plaintiff in this case is Ms. Mary Tardif.  She is represented by Stefan Hillel Krieger, Gideon Oliver, and Katherine Smith.  As I mentioned earlier, the individual Defendants are Officer Marsha Rumble, Officer Felix Schmidt, and Sergeant Thomas McManus. They are represented by Brachah Goykadosh and Joshua Lax.  Do you know, or have you had any personal or business dealings with the parties or their counsel?

9. To your knowledge, do you have any relatives, friends, associates, or employers who have had any dealings with, or been employed by, the parties or any of their attorneys?

10. Do you know or have you heard of any of the following people who may testify or whose names may be mentioned during the course of trial?

    a. Giovanni Mattera;

    b. Daniel Shockley;

    c. Stephanie Shockley;

    d. Maxine Dade;

    e. Lieutenant Sharon DeStefano;

    f. MariJade Storm Summers;

    g. Loreen Dick;

    h. Natalie Zilka;

      i.    Police Officer Alena Aminova;

      j.    Stacy Lanyon.

11. Are you familiar with anyone else present in the courtroom, including your fellow jurors, all Court personnel, and me?

## GENERAL JUROR QUESTIONNAIRE – PART II

**If your answer to any questions is "yes," please circle the number of that question on your copy of the questionnaire.  Do not write or make any other marks on the questionnaire; the only marks you should make are circles around the numbers of the questions for which your answer is "yes."**

12. Have you, or has any close friend or relative, ever studied or practiced law or worked in any capacity for a law office?

13. Have you or has any member of your immediate family ever been sued?

14. Have you or has any member of your immediate family ever been a defendant in a criminal case or been incarcerated?

15. Have you, or has any close friend or relative, ever worked in law enforcement—for example, as a police officer; as a security guard; at a jail or prison; in a local, state, or federal prosecutor's office; or in some other law enforcement capacity?

16. Do you know, or have any association—professional, business, or social, direct or indirect—with any member of the staff of the New York City Police Department ("NYPD")?

17. Do you have a job that causes you to work with any law enforcement officer or agency?

18. Have you ever witnessed an incident in which a police officer or other law enforcement officer used force against a person?

19. Have you, or has any close friend of relative, ever been questioned in any matter by a law enforcement agency? If so, does anything about that experience make it difficult for you to render a fair and impartial verdict?

20. Have you, or has any close friend or relative, ever made a complaint or filed a lawsuit against or about a police officer or other law enforcement personnel?

21. Have you, or has any close friend or relative, ever had any interaction with officers of the NYPD, or any other law enforcement officers?  If so, does anything about that experience make it difficult for you to render a fair and impartial verdict?

22. Have you, or has any close friend of relative, ever been involved in or appeared as a witness in any investigation by a federal or state grand jury, or by a Congressional or state legislative committee, licensing authority, or governmental agency?

23. Have you ever been a witness or a complainant in any hearing or trial?

24. Have you or has any member of your immediate family ever brought a lawsuit against anyone?

25. Are you or is any member of your family now under subpoena or, to your knowledge, about to be subpoenaed in any case?

26. Have you, or any of your relatives or close friends, ever been the subject of any investigation or accusation by any federal or state grand jury, or by a Congressional committee, to your knowledge?

27. Do you think that you would be more likely to believe or disbelieve the testimony of a person because he or she is a law enforcement official or works for the NYPD?

28. Have you, either through any experience you have had or anything you have seen or read, developed any bias, prejudice or other feelings <u>for or against</u> the NYPD or any other law enforcement agency?

29. Have you, or has any close friend or relative, ever worked for the City of New York?

30. Have you, anyone in your household, or a close friend, ever attended a demonstration, rally, protest, or march?

31. Have you heard of the Occupy Wall Street movement?

32. Have you, either through any experience you have had or anything you have seen or read, developed any bias, prejudice or other feelings <u>for or against</u> the Occupy Wall Street movement?

33. Have you, anyone in your household, or a close friend, ever been diagnosed with post-traumatic stress disorder, or any other similar trauma-related disorder?

34. Do you, anyone in your household, or a close friend, have epilepsy or any other medical condition that causes seizures?

35. Have you, anyone in your household, or a close friend, ever worked in the healthcare profession?

36. Have you, or has any close friend or relative, ever been the victim of a crime?

37. Do you have any reason to believe that anything in your life experience will make you partial to one side or another in this case?

38. Do you think that you could not sit fairly and impartially as a juror in a case involving claims like those in this case?

39. Will you be able to deliberate based solely on the evidence presented at trial and not based on any other information?

40. Will you able to evaluate each witness's credibility objectively, without bias or prejudice?

41. Under the law, the facts are for the jury to decide and the law is for the Court to decide. The two areas are separate and distinct. At the end of the case, I will instruct the jury on the law, and the jury is required to accept and apply the law as I explain it. If you are on the jury, you must accept the law as I explain it, even if you disagree with my explanation of the law. Would you have any difficulty following this instruction?

42. In these questions, I have tried to direct your attention to possible reasons why you might not be able to sit as a fair and impartial juror. Apart from any prior question, do you have the slightest doubt in your mind, for any reason whatsoever, that you would be able to serve conscientiously, fairly, and impartially in this case, and render a true and just verdict without fear, favor, sympathy, or prejudice, and according to the law as I will explain it to you?

## BIOGRAPHICAL JUROR QUESTIONNAIRE

Please write out your responses to these questions on this form.

1. Please state your juror number. _____

2. What is your county of residence?  Please list each county of residence during the past five years.

   _____

3. How far did you go in school?

   _____

4. What kind of work do you do?  (If retired or unemployed, describe your last employment.)

   _____

5. What is your job title?

   _____

6. How long have you been employed in your current position? If fewer than five years, where else did you work in the last five years?

   _____

7. Have you or has any member of your family ever been employed by the city, state or federal government?

   _____

8. Who are the members of your household and what kind of work do they do?

   _____

   _____

9. Do you have grown children who do not live with you?  What kind of work do they do?

   _____

   _____

10. What newspapers and magazines do you read on a regular basis?

_____

11. What websites or news apps do you visit or read on a regular basis?

_____

12. What television shows, radio programs, and/or podcasts do you watch or listen to on a regular basis?

_____

13. Do you belong to, or volunteer your time to, any associations, organizations, clubs or unions?

_____

14. What do you like to do in your spare time?

_____

15. Have you ever served as a juror? If so, when did you serve and were you on a grand jury or a regular jury? If a regular jury, was it a civil or criminal case? Did you reach a verdict? (**Do not tell us what the verdict was).**

_____

Court Exhibits

Tardif v. City of NY

13CV4056

UNITED STATES DISTRICT COURT
CHAMBERS OF
KIMBA M. WOOD
DISTRICT JUDGE
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312