UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MARY TARDIF,

               Plaintiff,

    -against-                        13-CV-4056 (KMW)

CITY OF NEW YORK,                  **OPINION & ORDER**

               Defendant.
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/14/2023

KIMBA M. WOOD, United States District Judge:

      On June 13, 2013, Plaintiff brought this action alleging, *inter alia*, a *respondeat superior* claim against Defendant based on an alleged assault and battery by Sergeant Giovanni Mattera. (*See* Compl., ECF No. 1; *see also* Third Am. Compl., ECF No. 135.) On July 1, 2022, following a nine-day jury trial, a jury returned a verdict in favor of Plaintiff, finding that Sergeant Mattera's conduct toward Plaintiff constituted battery and that Defendant was liable to Plaintiff based on *respondeat superior*. (Verdict Form at 2, ECF No. 587.) The jury awarded damages to Plaintiff in the amount of $431,250. (*Id.*) Judgment was entered on July 12, 2022. (ECF No. 550.)

      Defendant moved at trial for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, on which the Court reserved its decision. (Trial Tr. 1089:7–12; 1116:24–1117:10.) Defendant now renews that motion, or in the alternative, moves for a new trial pursuant to Rule 59. (ECF No. 580.) Defendant also moves for remittitur of the damages award. (*Id.*) Upon review of the record, including trial testimony and a video of some of the interaction between Sergeant Mattera and Plaintiff, and the parties' submissions, the Court finds no basis to disturb the jury's verdict. Therefore, Defendant's motions are DENIED.

**BACKGROUND**

The Court assumes familiarity with the background of this case, and reviews only those portions pertinent to Defendant's post-trial motions.

## I. Procedural History

On June 13, 2013, Plaintiff sued Defendant, the New York City Police Department, and officers and officials for violations of the Americans with Disabilities Act and various federal civil rights protections, and for assault and battery pursuant to New York law, based on police officers' treatment of Plaintiff during her participation in demonstrations associated with the Occupy Wall Street movement.  (*See* Compl.; *see also* Third Am. Compl.)  The claims that proceeded to trial included: (1) assault and battery claims pursuant to New York law against Sergeant Thomas McManus individually, and (2) a *respondeat superior* claim against Defendant predicated on alleged assaults and batteries by Sergeant Giovanni Mattera and Sergeant McManus.  A jury reached a verdict in favor of Defendant and the individual officers on all of Plaintiff's claims.  (J., ECF No. 356.)

On appeal, the Second Circuit affirmed the judgment as to the assault and battery claims against Sergeant McManus and the related *respondeat superior* claim against Defendant arising from Sergeant McManus's alleged conduct, but vacated the judgment as to the *respondeat superior* claim against Defendant relating to Sergeant Mattera's alleged assault and battery.  (*See* ECF No. 368.)  The case was remanded for a new trial on the remaining *respondeat superior* claim against Defendant.  (*Id.*)

## II. Trial Proceedings

Trial began on June 21, 2022.  Plaintiff testified first, then called Dr. Gregory Lawler, a neuroradiologist, as her first witness.  Plaintiff next called Dr. Ranga Krishna, a neurologist, and then Ms. Linda Lajterman, a certified life care planner.

**A. Plaintiff's Testimony**

Plaintiff began her testimony by describing an encounter with Sergeant Mattera in the early morning of March 21, 2012, during the course of her participation in an Occupy Wall Street protest. Plaintiff testified that Sergeant Mattera threw her down during the encounter, which caused her head to hit the ground. (Trial Tr. 163:15–178:25.) She testified that, in the ensuing moments, she lost consciousness and was transported by ambulance to a hospital. (*Id.* 179:4–21.) At the hospital and afterward, Plaintiff began experiencing headaches, nausea, dizziness, and impaired vision. (*Id.* 180:1–182:6.) Shortly thereafter, on March 24, 2021, Plaintiff received an MRI of her brain. (*Id.* 390:15–391:2–4; 470:21–22.)

Plaintiff also testified that the symptoms she began experiencing at the hospital continued until the time of trial. (*Id.* 179:22–182:15; 183:22–184:9; 193:5–195:9.) In her words, these conditions "took a lot away from [her]," and prevented her from being "where [she] wanted to be with [her] work and where [she] wanted to be in life." (*Id.* 195:14–196:7.)

Defense counsel questioned Plaintiff concerning a number of incidents between January 2012 and February 2018 in which Plaintiff had hit her head, which Defendant asserted could have caused the symptoms of which Plaintiff complained. (*Id.* 247:6–250:4.) During that time, Plaintiff was the subject of a number of MRIs that sought to assess any damage to Plaintiff's brain. (*Id.* 249:9–11.) Plaintiff was also questioned about, among other things, her medical records from a visit to a physician in January 2021, which state that "the patient states she has never had these symptoms prior to November 2020 and notes that she has no preexisting history of headaches, vertigo, or visual symptoms." (*Id.* 206:12–213:14.) In response to defense counsel's challenging the consistency of that medical record with Plaintiff's testimony at trial, Plaintiff testified that her statement to her doctor concerned only the severity of her symptoms, and testified that the physician's notes did not reflect the full extent of her discussion at that visit.

(*Id.* 211:3–212:8.)

### B. Dr. Lawler's Testimony

Plaintiff's expert Dr. Lawler, a neuroradiologist, testified regarding five MRI studies of Plaintiff's brain conducted in April 2009, on March 24, 2012, shortly after the incident with Sergeant Mattera, in February 2018, in January 2021, and in July 2021. (Trial Tr. 389:21–391:8; 430:5–22.) He stated that MRIs typically consist of approximately 500 images of the brain, and that in reviewing Plaintiff's MRIs, he "compare[d] anatomically each slice with the corresponding slice on different studies." (*Id.* 396:9–24; 399:17–400:4.)

Upon review of the MRIs, Dr. Lawler testified that all of Plaintiff's post-incident MRIs, beginning with the March 24, 2012 MRI, showed an abnormality in the white matter on the right hemisphere of Plaintiff's brain. (*Id.* 356:15–362:6; 396:9–24; 430:5–22.) He also testified that this abnormality was "stable" across the post-incident MRIs, and that the pre-incident MRI from April 2009 did not show this abnormality. (*Id.* 389:22–390:3; 393:2–20; 403:5–21.) Dr. Lawler testified that the abnormality in the post-incident MRIs, also known as a white matter hyperintensity, is "usually permanent" and is evidence of "axonal injury"—that is, damaged brain tissue. (*Id.* 357:4–358:19.) In his opinion, the particular location of this white matter hyperintensity, at the gray/white matter junction of the brain, indicated that Plaintiff had suffered a "rapid deceleration injury" to her brain. (*Id.* 359:13–362:6.) In response to defense counsel's questioning regarding what defense counsel described as "a small fuzzy spot" on an image from the April 2009 MRI, which defense counsel asserted appeared in the same location as the abnormality Dr. Lawler observed in Plaintiff's later studies, Dr. Lawler stated that, although this one image might show an "averaging of the cortex . . . giving . . . [the] appearance that there's a hyperintensity," upon his review of "all the images [in the April 2009 study, he] did not see a hyperintensity in the area" about which defense counsel had asked. (*Id.* 474:5–7; 490:7–13.)

4

### C. Dr. Krishna's Testimony

Dr. Krishna, a neurologist, testified regarding his neurological examination of Plaintiff and his review of the five MRIs of Plaintiff's brain described above.  He testified that his exam showed that Plaintiff "had a rapid decline in her short-term memory" (Trial Tr. 510:17–511:9), which when considered alongside Plaintiff's complaints of symptoms including headaches, dizziness, nausea, and impaired vision, was consistent with a traumatic brain injury.  (*Id.* 514:22–516:6.)

Dr. Krishna testified that the white matter intensity he observed in the post-incident MRIs, but not in the pre-incident MRI, indicated that Plaintiff had suffered head trauma.  (*Id.* 511:15–515:14; 522:9–524:9.)  Furthermore, he testified that these records showed that Plaintiff had "axonal loss in the corona radiata [the area of the brain that transmits informational fibers], and [that] this was consistent over the years." (*Id.* 517:24–518:8.)  Specifically, Dr. Krishna stated that the abnormality he observed in the post-incident MRIs was "a fixed neurological deficit" that was "present from 2012 onwards," that it was in "the same location, and [that] the damage . . . ha[d] not changed. . . . [T]he size, intensity stayed the same." (*Id.* 522:9–524:9; 530:7–531:4.)

Dr. Krishna also testified that damage from a traumatic brain injury is permanent, and thus that Plaintiff would require ongoing care for symptoms resulting from that injury.  (*Id.* 531:18–532:3.)  In response to defense counsel's questioning regarding Plaintiff's medical records from 2009, 2012, and 2014 concerning other incidents in which Plaintiff hit her head, Dr. Krishna declined to change his opinion that Plaintiffs symptoms were consistent with a traumatic brain injury, evidence of which he first observed in the March 24, 2012 post-incident MRI.  (*See id.* 558:1–564:3.)  Notwithstanding defense counsel's assertion that some of Plaintiff's medical records did not note Plaintiff's symptoms, Dr. Krishna maintained that he believed Plaintiff's

5

symptoms had been ongoing since 2012 and were permanent, but that their "intensity [could] change on a day-by-day basis." (*Id.* 563:1–564:3.) Accordingly, Dr. Krishna recommended the following forms of future medical care, nearly all of which he believed Plaintiff would require for the rest of her life: regular specialist visits, therapy, regular brain imaging, continuing neurological care and medication, and nerve injections. (*Id.* 533:21–537:16.)

### D. Ms. Lajterman's Testimony

Ms. Lajterman, a certified life care planner, testified on Plaintiff's behalf regarding the estimated costs of Plaintiff's future medical care. In arriving at an overall life care plan for Plaintiff, Ms. Lajterman testified that she reviewed Plaintiff's medical records, Dr. Krishna's report, and that she interviewed Plaintiff regarding Plaintiff's functional limitations. (Trial Tr. 622:5–625:10; 672:1–17.) In particular, Ms. Lajterman compared Plaintiff's interview responses with "the records to see if what [Plaintiff] told [her was] consistent with what [Plaintiff] was reporting to her treaters." (*Id.* 672:13–17.) When questioned about Plaintiff's past treatment, Ms. Lajterman testified that "[t]welve years of past treatment isn't going to impact what goes into [her] report" because her report concerned Plaintiff's future projected care costs. (*Id.* 671:17–21.) Ms. Lajterman estimated these costs at $1,131,062.20, not accounting for any discount to present value. (*Id.* 631:7–17.)

Following deliberations, the jury returned a verdict in favor of Plaintiff on her battery claim, but declined to do so on her assault claim. (*Id.* 1251:1–5.) The jury awarded $431,250 in future compensatory damages. (*Id.* 1251:14–17.)

## DISCUSSION

The Court addresses the parties' arguments pursuant to Rule 50 and 59 separately. As discussed in more detail below, there is no basis to overturn the jury's verdict.

I.      **Motion for Judgment as a Matter of Law Pursuant to Rule 50**

Rule 50 of the Federal Rules of Civil Procedure provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . resolve the issue against the party . . . [and] grant a motion for judgment as a matter of law[.]"  Fed. R. Civ. P. 50(a)(1).  This rule "imposes a heavy burden on a movant," a burden that is "'particularly heavy' where, as here, 'the jury has . . . returned its verdict' in favor of the non-movant."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).

In ruling on a Rule 50 motion, a court must "give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (internal quotations and citations omitted).  Accordingly, a court may set aside a verdict only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that [a] reasonable and fair minded [jury] could not arrive at a verdict against him."  *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (internal quotations and citation omitted).

At trial, Defendant moved for judgment as a matter of law pursuant to Rule 50 on three grounds.  First, Defendant sought dismissal of Plaintiff's assault claim for lack of evidence.  (Trial Tr. 1089:7–12.)  Second, Defendant "move[d] to dismiss [damages] claims associated with [P]laintiff's alleged brain injury," arguing that no reasonable juror could find that Sergeant Mattera's actions on March 21, 2012 caused Plaintiff's brain injury.  (*Id.* 1106:11–1107:5.)  Finally, Defendant argued that no reasonable juror could conclude that Plaintiff's claim for

7

future economic damages was attributable to any injury allegedly caused by Sergeant Mattera's conduct. (*Id.* 1107:6–24.) The Court reserved its decision on Defendant's Rule 50 motion. (*Id.* 1117:9–10.) Because the jury did not find Defendant liable for assault (*id.* 1250:25–1251:5), Defendant's first basis for judgment as a matter of law was rendered moot.

As for Defendant's second argument, there was sufficient evidence to support the jury's finding that Sergeant Mattera's conduct caused Plaintiff's traumatic brain injury. The jury instructions state that the jury "may award compensatory damages only for injuries that Plaintiff proved by a preponderance of the evidence were caused by wrongful conduct committed by Sergeant Mattera." (Jury Instructions at 12.) Defendant asserts that Plaintiff's direct testimony regarding the onset of symptoms from a traumatic brain injury in 2012 was contradicted by Plaintiff's testimony on cross-examination and by her medical records. (Def.'s Mem. at 9, ECF No. 582.) According to Defendant, "none of [Plaintiff's] medical records until 2020—following another head injury—document the symptoms now claimed as evidence of a traumatic brain injury in 2012." (Def.'s Reply at 3, ECF No. 596.)

Defendant also contends that "no reasonable juror could have found [P]laintiff's [medical] expert[s'] opinions reliable," and that these experts could not or did not offer an opinion as to the cause of Plaintiff's symptoms. (Def.'s Mem. at 5, 9–10, 12.) Thus, the jury was left to "speculate as to causation of [Plaintiff's] alleged brain injury." (*Id.* at 12.) In support of this argument, Defendant states that Dr. Krishna failed to consider Plaintiff's medical records from April 2018 in coming to his conclusions, and that Dr. Lawler "was unable to definitively state whether the MRI from 2009 did or did not show the same T2 white matter hyperintensity [as in Plaintiff's 2021 imaging]." (*Id.* at 10–12.)

Defendant's assertion that Plaintiff's medical experts were "unreliable" (*see id.* at 9–10,

8

11) challenges their credibility and the weight that should be given to their testimony. These issues were properly before the jury, and it apparently credited the testimony of Plaintiff and her medical experts over the alternative arguments as to causation that were advanced by Defendant, as it was entitled to do. In addition, to the extent Defendant contends that Plaintiff's medical records are in conflict with her testimony, the jury was permitted to resolve any conflict against Defendant and conclude that the March 21, 2012 incident caused Plaintiff's brain injury. Accordingly, the Court declines to intrude on the jury's role to assess witness credibility and weigh the evidence in a Rule 50 motion.

As for Defendant's third argument, there was a legally sufficient basis for the jury to find that Plaintiff's future damages were attributable to her alleged injury (and thus to Sergeant Mattera's conduct). Defendant argues that Plaintiff's recommended future medical care cannot be distinguished from any care she otherwise would have required for her pre-existing conditions. (Def.'s Mem. at 13.) In particular, Defendant states that Dr. Krishna was unable to "offer[] any opinion as to which portion, if any, of [Plaintiff's] future medical care is attributable to the injury [P]laintiff was claiming in this case or [is] a result of her other conditions[.]" (*Id.*) Defendant contends that Ms. Latjerman "was also unable to offer an opinion as to whether the care she determined was necessary was based [on P]laintiff's previous and underlying health issues or due to the interaction with [Sergeant] Mattera." (*Id.*)

The fact that Plaintiff's experts did not expressly state that Plaintiff's future damages were attributable to her alleged brain injury does not mean that the jury, in light of the evidence available to it, could not have reached that conclusion. Dr. Krishna testified that he believed a traumatic brain injury caused Plaintiff to experience symptoms such as visual disturbances, short-term memory loss, dizziness, balance issues, and headaches. (*See, e.g.*, Trial Tr. 514:22–

9

515:14; 517:20–518:8; 520:24–521:20.) He also described various forms of treatment to address the symptoms resulting from a traumatic brain injury, including regular specialist visits, therapy, and medication. (*Id.* 533:18–537:16.) Ms. Lajterman stated that she was not opining on etiology—the underlying cause of Plaintiff's symptoms—in her capacity as a life care planner. (*Id.* 674:11–21.) Instead, she testified as to the cost of Dr. Krishna's recommendations for Plaintiff's future care. (*Id.* 625:24–631:14.) The jury was permitted to assess these experts' testimonies, including any weaknesses Defendant asserts they contain, and draw its own conclusion as to attribution of Plaintiff's future medical care.

In sum, Plaintiff has offered both witness testimony and documentary evidence that support the jury's verdict. Viewing this evidence in the light most favorable to Plaintiff, the jury could have reasonably concluded from this evidence that Sergeant Mattera's actions caused Plaintiff's brain injury, and that her alleged future damages were attributable to that injury. Therefore, Defendant has failed to show that the jury lacked a legally sufficient basis in arriving to its verdict.

## II. Motion for a New Trial Pursuant to Rule 59

Pursuant to Rule 59, a "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1). Although the standard for granting a new trial pursuant to Rule 59 is less onerous than that for granting judgment as a matter of law pursuant to Rule 50, it is still high. *See DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). For a court to order a new trial, it must conclude that "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *Song*, 957 F.2d at 1047 (quotations and citations omitted). Moreover, in considering a Rule 59 motion, "a court should rarely disturb a

jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134.

Defendant argues that there are three reasons to reject the jury's verdict. First, Defendant argues that the jury's verdict was against the weight of the evidence. (Def.'s Mem. at 8–14.) Second, Defendant contends that the jury's verdict was inconsistent because the jury awarded Plaintiff nothing for past compensatory damages, but awarded $431,250 for future compensatory damages. (Def.'s Mem. at 14–16; *see also* Def.'s Reply at 7–8.) Third, Defendant argues that the jury's award is excessive. (Def.'s Mem. at 16–18.)

### A. The Jury's Verdict Was Not Against the Weight of the Evidence

As for Defendant's first argument, there was sufficient evidence, described in detail above, to support the jury's finding that Sergeant Mattera's actions caused Plaintiff's brain injury. Both Drs. Lawler and Krishna testified that they observed evidence of a traumatic brain injury in all of the post-incident MRIs, but not in the pre-incident MRI, and that the damage observed in the post-incident MRIs was consistent over time. (*See, e.g.*, Trial Tr. 393:2–20; 430:5–22; 522:9–524:9.) Furthermore, Dr. Lawler rejected defense counsel's contention that "a small fuzzy spot," in one image from the April 2009 MRI showed that the abnormality existed prior to 2012, explaining that, upon review of all the images in that MRI, he concluded that there was no hyperintensity in that area. (*Id.* 474:1–18.) Defendant has not persuaded the Court that the jury's apparent finding that Drs. Lawler and Krishna were credible should be rejected. As for Defendant's argument regarding the apparent absence of Plaintiff's symptoms prior to 2020, Plaintiff's medical records from her hospital visit immediately after the March 21, 2012 incident show that she was experiencing nausea, vomiting, visual blurring, and headaches. (Pl.'s Ex. 29, ECF No. 593-1.) In addition, Plaintiff's medical records from January, March, and November 2014 show that she was experiencing headaches, balance issues, vision impairment, and memory loss throughout that time. (Pl.'s Ex. 27, ECF No. 593-2.) Accordingly, the Court declines to

11

conclude that the jury's verdict was "seriously erroneous" or a "miscarriage of justice."

### B. Defendant Has Waived Its Inconsistency Objection

Defendant contends that the jury's finding of no liability for past damages is inconsistent with its finding of liability for future damages. "It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006). There is no dispute that Defendant did not object on inconsistency grounds before the Court discharged the jury. The parties, however, disagree as to whether Defendant has waived its objection to the jury's award.

Defendant argues that the Court should overlook its failure to timely object for two reasons. First, it suggests that the Court dismissed the jury before Defendant had an opportunity to voice an objection. (Def.'s Reply at 7.) Second, Defendant contends that a timely objection would have been futile because, even if made, the nature of the inconsistency was such that it would not have been curable upon resubmission to the jury. (*Id.* at 6.) The jury's error, in Defendant's view, "did not result from an error in the charge or the verdict form." (*Id.*) Instead, Defendant contends that "the factual findings underlying the jury's verdict were irreconcilable," and thus "this inconsistency could not have been remedied through resubmission." (*Id.*)

These arguments lack merit. First, nothing in the record suggests that Defendant was denied the opportunity to timely raise an inconsistency objection. For example, Defendant could have objected after the Court had finished reading the jury's verdict and before the jurors were polled, or as the jurors were leaving the courtroom, when there was still time for the Court to recall them. Defendant failed to do so. (*See* Trial Tr. 1251:21–25; 1252:19–1253:4.)

Second, Defendant's argument regarding the futility of resubmission is not persuasive. Defendant has not adequately explained why a potential inconsistency in the jury's award could

not have been corrected "by resubmitting the matter to the jury after providing 'some further instruction.'" *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 48 (2d Cir. 2015) (quoting *Kosmynka*, 462 F.3d at 83–84). Moreover, if Defendant was aware of the potential for inconsistency, it has not explained why it did not alert the Court accordingly, so that it could be addressed. *See Kosmynka*, 462 F.3d at 83–84 (explaining that the purpose of the timely objection requirement is to "expos[e] the inconsistency before the jury is dismissed, so that the court has available to it the option of re-submitting the questions to the jury after some further instruction"). Therefore, the Court concludes that Defendant has waived its argument regarding the inconsistency of the jury verdict, and a new trial would not be appropriate on that ground.[1]

Even if Defendant had made a timely objection with respect to this claimed inconsistency, Defendant's inconsistency argument fails on the merits. "When the jury's findings appear to be inconsistent with each other, the Seventh Amendment requires that if there is a view of the case which makes the jury's answers . . . consistent, the court must adopt that view[.]" *Auwood v. Harry Brandt Booking Off. Inc.*, 850 F.2d 884, 891 (2d Cir. 1988). That is, "if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993).

Defendant argues that the jury's decision not to award past compensatory damages cannot be reconciled with its decision to award future compensatory damages. There is,

---

[1] Defendant, citing *Kosmynka*, states that the "Second Circuit has agreed that the inconsistency of a verdict need not always be remedied through resubmission prior to the discharge of the jury." (Def.'s Reply at 6.) It is true that *Kosmynka* did not impose an absolute obligation on a party dissatisfied with a verdict to ensure that the court keep the jury. *Kosmynka*, 462 F.3d at 83. The focus of that discussion in *Kosmynka*, however, was on whether the court had been placed "on notice of the inconsistency." *Id.* At that point, "each party has the choice of what to advocate and the court has the choice of what to do." *Id.* Here, however, Defendant has not established that it placed the court on notice. At no point before or after the jury had returned its verdict did Defendant raise the issue of a potential inconsistency with respect to the past and future compensatory damages awards. Accordingly, Defendant's reliance on *Kosmynka* on this issue is misplaced.

however, a view that reconciles the two—namely that the jury may have believed that it should consider the evidence in support of calculating past and future damages separately. Accordingly, the jury may have found that Plaintiff had not provided enough evidence from which it could calculate an amount of past compensatory damages. Indeed, Plaintiff concedes that "there is no evidence in the record about past medical expenses" (Pl.'s Mem. Opp'n at 22, ECF No. 590), and thus the jury may have concluded that it could only speculate as to the amount. By contrast, the jury may have concluded that Plaintiff had provided enough evidence, in particular Dr. Krishna's and Ms. Lajterman's testimonies, to calculate an amount of future compensatory damages, which it found to be $431,250. Thus, it was possible for the jury to conclude that there was enough evidence to find that Sergeant Mattera's conduct caused Plaintiff's brain injury, while also concluding that Plaintiff had not provided enough evidence from which the jury could calculate a specific value of past compensatory damages to be awarded. Viewed in this light, the jury's past and future compensatory damages awards are not "ineluctably inconsistent." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001)).

### C. The Jury's Award Was Not Excessive

Defendant seeks remittitur of the jury's future compensatory damages award, arguing that it was excessive. (Def.'s Mem. at 16–18.) "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001)). "A district court may order a new trial in whole or limited to damages, or grant remittitur by conditioning the denial of a defendant's motion for a new trial on the plaintiff accepting the reduction in damages, if the court finds that the damages awarded by the jury are excessive." *Rainone v. Potter*, 388 F. Supp.

2d 120, 121 (E.D.N.Y. 2005) (citing *Tingley Sys. v. Norse Sys.*, 49 F.3d 93, 96 (2d Cir. 1995)).

A federal court reviewing the amount of damages awarded pursuant to a state law claim, as here, must apply state law. *See Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005); *see also Gasperini v. Ctr. for the Humanities, Inc.*, 518 U.S. 415, 419, 430–31 (1996). Pursuant to New York law, "[i]n reviewing a money judgment . . . in which it is contended that the award is excessive or inadequate . . . [a court] shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). "In applying this standard, a district court reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented." *Presley v. U.S. Postal Serv.*, 317 F.3d 167, 173 (2d Cir. 2003). "Great deference must be accorded the interpretation of the evidence by the jury if there is present credible evidence sufficient to support that interpretation, even if other evidence can be found in the record which would support a contrary conclusion[.]" *Simone v. Crans*, 891 F. Supp. 112, 112 (S.D.N.Y. 1994) (Parker, J.).

As an initial matter, neither of the cases Defendant cites in support of remittitur (*see* Def.'s Mem. at 17–18) involved a brain injury, as is the case here. The Court notes that Defendant contends that the Court should base its excessiveness inquiry primarily on "cases involving similar force allegations." (*Id.* at 17.) The proper focus of a damages award inquiry, however, is on the nature of the injuries suffered, whatever their causes may be. *See* 2 AM. L. OF TORTS §§ 8:7–9 (2022).

In this case, Plaintiff alleges that she will require various forms of medical care to treat the headaches, nausea, vision impairment, and memory loss resulting from her traumatic brain injury. As described above, Dr. Krishna and Ms. Lajterman testified as to the medical necessity

and estimated cost, respectively, of this future medical care. In light of the evidence presented, the jury found that an award of $431,250 would fairly compensate Plaintiff for future damages resulting from Sergeant Mattera's conduct. (Verdict Form at 2.) The jury further provided that this amount was intended to provide compensation for a period of 48.6 years. (*Id.*)

The jury's award is appropriate when compared with damages awards for brain injuries in other New York state cases. Courts have awarded plaintiffs amounts ranging from $500,000 to $3 million for future pain and suffering on account of brain injuries. *See, e.g.*, *Ramirez v. City of New York*, 719 N.Y.S.2d 289 (App. Div. 2001) (*"Ramirez"*); *Henaghan v. Algie*, No. 04233/2008, 2013 WL 6036725 (Suffolk Cty. Ct. Nov. 14, 2013) ("*Henaghan*"); *Paek v. City of New York*, 812 N.Y.S.2d 83 (App. Div. 2006) ("*Paek*").

In *Ramirez*, the Appellate Division upheld an award of $500,000 for future pain and suffering where "the plaintiff sustained permanent brain damage as a result of an assault upon him by police officers." 719 N.Y.S.2d at 289–90. This award did not specify a period of time over which the amount of future damages was intended to provide compensation. In *Henaghan*, a court awarded the plaintiff $525,000, based on his life expectancy of twenty-one years (or a per-year rate of $25,000), in future damages associated with his traumatic brain injury. 2013 WL 6036725, at *4–5. In that case, the plaintiff suffered from short-term memory impairment and had some difficulty speaking, but "did not demonstrate any need for long-term home health care, nor other assistance." *Id.* at *4. The court noted that the severity of that plaintiff's injuries did not appear to be as great as in other traumatic brain injury cases, in which plaintiffs were awarded between $650,000 and $2.1 million for future pain and suffering. *Id.* Finally, in *Paek*, the Appellate Division reduced an award of $5 million for future pain and suffering over 40 years to $3 million. 812 N.Y.S.2d at 84–85. In that case, the plaintiff "sustained a severe brain

16

injury resulting in, inter alia, permanent cognitive impairment affecting her memory, concentration, organizational ability and emotional response." *Id.* at 85. The award in *Paek* amounts to an annual rate of $75,000.

In light of these decisions, the Court finds that the jury's award of $431,250 for a period of 48.6 years—or approximately $8,873 for each year—does not deviate materially from what would be reasonable compensation. Because this award was not excessive, the Court declines to remit the jury's award of future compensatory damages to Plaintiff.

## CONCLUSION

For the foregoing reasons, Defendant's motion for judgment as a matter of law is DENIED. Defendant's motions for a new trial or remittitur of damages are also DENIED.

The Clerk is respectfully directed to close the motions at ECF No. 580. In addition, the Court lifts its stay regarding execution of the judgment (*see* ECF No. 598), now that Defendant's post-trial motions have been resolved.

SO ORDERED.

Dated: New York, New York
March 14, 2023

/s/ Kimba M. Wood
KIMBA M. WOOD
United States District Judge